The SIOUX TRIBE OF INDIANS

v.

The UNITED STATES.

No. 74.

United States Claims Court.

Feb. 22, 1985.

Arthur Lazarus, Marvin J. Sonosky, and William H. Payne, Washington, D.C., for plaintiffs.

Edward A. Passarelli, Washington, D.C., with whom was Asst. Atty. Gen., F. Henry Habicht, II, Washington, D.C., for defendant.

## ORDER TERMINATING DOCKET 74 AND AWARDING FINAL JUDGMENT

YOCK, Judge.

This case involves the appropriate valuation to be placed upon Sioux tribal land which the plaintiff ceded to the Federal Government under the Treaty of April 29, 1868 (1868 Treaty). 15 Stat. 635. During the last 60 years, the plaintiff, the Sioux Tribe of Indians, has initiated significant litigation involving claims arising out of the 1868 Treaty. *See Sioux Nation of Indians v. United States*, 220 Ct.Cl. 442, 446–47, 601 F.2d 1157, 1159, *aff'd*, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980); *Sioux Tribe of Indians v. United States*, 85 Ct.Cl. 181, *cert. denied*, 302 U.S. 717, 58 S.Ct. 37, 82 L.Ed. 554 (1937); *Sioux Tribe of Indians v. United States*, 84 Ct.Cl. 16 (1936). This particular case, seeking adequate compensation for the tribal land ceded to the Federal Government under the 1868 Treaty, has now entered its 35th year

of litigation.[1] The case has outlasted two tribunals, the Indian Claims Commission (1945–1978) and the United States Court of Claims (1855–1982), and threatens to outlast the current tribunal, the United States Claims Court, if allowed to proceed ad infinitum. Further, over the last 35 years of litigation, more than 28 judges and commissioners have exercised jurisdiction over this complex litigation.

This case was filed on behalf of the Sioux Tribe of Indians ("Sioux Nation")[2] by eight separate reservation tribes ("reservation tribes"). These eight reservation tribes are: (1) the Crow Creek Sioux Tribe; (2) the Santee Sioux Tribe of Nebraska; (3) the Lower Brule Sioux Tribe; (4) the Oglala Sioux Tribe of the Pine Ridge Reservation; (5) the Cheyenne River Sioux Tribe; (6) the Fort Peck Sioux Tribe; (7) the Rosebud Sioux Tribe; and (8) the Standing Rock Sioux Tribe. For the purposes of this litigation, the eight reservation tribes are represented by three attorneys.[3] As a result, while this case has only one plaintiff, the Sioux Nation, such plaintiff is made up of eight separate and distinct reservation tribes, each with its own legal philosophy and agenda about how the litigation should proceed and with what final result.

Throughout the long history of this case, the plaintiff has claimed that the defendant provided inadequate compensation for the Sioux tribal land ceded to the United States under the 1868 Treaty. The 1868 Treaty, one of several treaties signed at Fort Laramie, resulted in the acquisition by the Federal Government of vast acreage of Sioux tribal land, in what is now North Dakota, South Dakota, Montana, Wyoming and Nebraska. In return, the treaty provisions established the Great Sioux Reservation in the western half of South Dakota and obligated the Federal Government to provide the tribes with money, goods, services, and land.

The remaining issue in this case concerns the amount of valid offsets, if any, that the Federal Government may assert against the plaintiff's interlocutory land valuation award of $43,949,700. *See Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 257 (1978). These remaining offset issues, however, are not inconsiderable. In fact, the defendant claims that it is entitled to some $65 million in total offsets against the plaintiff's $44 million interlocutory land valuation award.

The issue now before this Court is whether the Court should terminate this action at this time or allow further prolonged litigation. For the reasons stated herein, and after a long and careful review of all of the evidence now before the Court, this Court has decided to terminate this litigation and to award the plaintiff $39,749,700 as fair and equitable compensation for its claims. This amount reflects the parties' counsels' negotiated settlement agreement as to what they considered to be fair and equitable compensation for the plaintiff's claims, and, more importantly, it represents an amount that this Court believes constitutes fair and equitable compensation for the plaintiff's historical claims, after taking into consideration the plaintiff's interlocutory land valuation award of $43,949,700 and the Federal Government's offset claims of some $65 million.

*Facts*

In 1950, following the passage of the Indian Claims Commission Act, 60 Stat.

---

**1.** On August 15, 1950, the plaintiff filed its original claim with the Indian Claims Commission. In 1978, upon termination of the Indian Claims Commission, this case was transferred to the United States Court of Claims. Subsequently, on October 1, 1982, upon termination of the Court of Claims, this case was transferred to the United States Claims Court.

**2.** While this Court recognizes that these eight reservation tribes do not comprise the entire Sioux Nation of Indians, the Court has adopted such terminology in the interests of clarity for purposes of this complex case.

**3.** Mr. Arthur Lazarus, Jr., is the attorney of record in this action for the plaintiff, and specifically represents both the Oglala Sioux Tribe of the Pine Ridge Reservation and the Cheyenne River Sioux Tribe. Mr. William Howard Payne represents the Fort Peck Reservation Sioux Tribe, and Mr. Marvin J. Sonosky represents the remaining five reservation tribes named herein.

1049 (1946), *codified at* 25 U.S.C. § 70 *et seq.* (1976), the plaintiff filed its original Docket 74 case with the Indian Claims Commission (hereinafter Commission). Throughout the next 28 years, the Docket 74 case was litigated, dismissed, appealed, reconsidered, severed into two claims,[4] and relitigated until the Commission rendered its final decision on the merits, land valuation, and offsets. *Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 214, 256 (1978); *Sioux Tribe v. United States,* 42 Ind.Cl. Comm. 257 (1978).

On July 19, 1978, the Commission awarded the Sioux Nation $43,949,700, as compensation for the total value of the Sioux interests extinguished under the 1868 Treaty. *Sioux Tribe v. United States,* 42 Ind. Cl.Comm. 214 (1978); *Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 257 (1978). However, construing the treaty to be one of peace, rather than cession, the Commission denied the defendant any payments on the claim offsets. In addition, the Commission denied the defendant any gratuitous offsets, based upon the defendant's grossly dishonorable dealings with the plaintiff between 1875 and 1877. *Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 214, 232 (1978). The Commission stated that such conduct "so taint[s] the course of dealings between the United States and the Sioux that we cannot in good conscience offset any gratuitous expenditures by the United States against any Sioux award in this docket." *Sioux Tribe v. United States, supra,* 42 Ind.Cl.Comm. at 232.

On appeal from the above decision of the Commission, the Court of Claims reversed the Commission's decision to deny the defendant any payment on the claim offsets and any gratuitous offsets. *United States v. Sioux Tribe,* 222 Ct.Cl. 421, 616 F.2d 485 (1980). In so holding, the Court of Claims found that the 1868 Treaty was primarily a treaty of cession, rather than a treaty of peace, and, as a result, reasoned that payment on the claim offsets were, "at least in substantial part, compensation for the land the Indians ceded to the government." *United States v. Sioux Tribe, supra,* 222 Ct.Cl. at 425, 616 F.2d at 487. Thus, the court reversed the Commission's decision denying all of the Federal Government's payment on the claim offsets.

The Court of Claims also reversed the Commission's decision to deny the defendant any gratuitous offsets. In so holding, the court, while recognizing that the Commission had considerable discretion to determine whether to allow gratuitous offsets, held that such a determination must reflect the "entire course of dealings" between the Federal Government and the Sioux.[5] *United States v. Sioux Tribe, supra,* 222 Ct.Cl. at 431, 616 F.2d at 491. The Court of Claims noted, however, that the allowance of such gratuitous offsets is contingent on the entire course of dealings between the defendant and the plaintiff. *United States v. Sioux Tribe, supra,* 222 Ct.Cl. at 432, 616 F.2d at 491. *See also United States v. Emigrant New York Indians,* 177 Ct.Cl. 263, 287 (1966); *Sioux Tribe of Indians of the Lower Brule Reservation v. United States,* 161 Ct.Cl. 413, 416, 315 F.2d 378, 380, *cert. denied,* 375 U.S. 825, 84 S.Ct. 66, 11 L.Ed.2d 57 (1963).

The Court of Claims further decided that the Federal Government was entitled to an opportunity to show which of the claimed expenditures were payments on the claim for land and which were gratuitous offsets. The case was subsequently remanded to

---

**4.** The Indian Claims Commission retained those claims relating to the 1868 Treaty, 15 Stat. 635, in Docket 74. The Commission, however, severed those claims arising out of the Act of February 28, 1877, 19 Stat. 254, and reassigned to Docket 74-B those compensation claims for the taking of the Black Hills region in what is now the State of South Dakota. In resolution of the Docket 74-B claims, the Court of Claims awarded the Sioux Indians approximately $104 million dollars for the taking of the Black Hills.

*See Sioux Nation of Indians v. United States,* 220 Ct.Cl. 442, 601 F.2d 1157 (1979), *aff'd,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980).

**5.** Further, the court noted that the Sioux had previously been awarded full compensation for the Federal Government's improper conduct between the years 1875 and 1877. *United States v. Sioux Tribe, supra,* 222 Ct.Cl. at 432, 616 F.2d at 491–92.

the Court of Claims' trial division, now the U.S. Claims Court, for appropriate reconsideration of the amount of Federal Government offsets, if any, which should be allowed against the plaintiff's land valuation award. *United States v. Sioux Tribe, supra*, 222 Ct.Cl. at 433, 616 F.2d at 492. In remanding this case, however, the Court of Claims let stand the Commission's interlocutory land valuation award of $43,949,700 in favor of the plaintiff.

The only issues remaining in this case, therefore, concern the amount of Federal Government offsets, if any, which should be allowed against the plaintiff's $43,949,700 land valuation award. As discussed above, the Federal Government is claiming some $65 million in offsets. However, it appears to this Court, after reviewing all of the evidence, that the total allowable offsets will not exceed some $6 million. Several hundred thousand pages of exhibits have already been presented to the Court and its predecessor tribunals on these issues. This Court tried the course of dealings/historical evidence phase of the offset issue on May 10–13, 1982.

The final accounting phase of the offset issue was scheduled to take place after the parties briefed, and the Court decided, six separate summary judgment motions on legal issues. *See Sioux Tribe of Indians v. United States*, No. 74 (Cl.Ct. May 14, 1982) (Trial Judge's Post-Trial Order). This Court has so far decided three of the summary judgment motions concerning payment on the claim offsets, gratuitous offsets, and land adjustment claims. *Sioux Tribe of Indians v. United States*, 6 Cl.Ct. 91 (1984) (Summary Judgment Opinion—I); *Sioux Tribe of Indians v. United States*, 7 Cl.Ct. 468 (Cl.Ct.1985) (Summary Judgment Opinion—II); *Sioux Tribe of Indians v. United States*, 7 Cl.Ct. 481 (Cl.Ct.1985) (Summary Judgment Opinion—III). The three remaining summary judgment motions concern issues involving res judicata/collateral estoppel, the use of vouchers to prove offset claims, and other miscellaneous issues.

In view of the complexity of the issues presented and of the length of time necessary to complete this litigation, this Court has consistently pressed the parties to explore all avenues leading to an expeditious, fair and equitable termination of this litigation, including settlement. Approximately six years ago, counsel for the parties reached agreement on a negotiated settlement which would have resolved this case. *See Sioux Tribe of Indians v. United States*, No. 74 (Cl.Ct. Dec. 13, 1978) (Defendant's Motion for Enlargement of Time). However, this settlement proposal failed to gain the approval of the plaintiff, since the governing bodies of six of the eight reservation tribes simply refused to consider the settlement offer. The other two reservation tribes agreed to the settlement offer.

Following the conclusion of the course of dealings/historical evidence phase of the offsets trial, held on May 10–13, 1982, the parties again indicated their willingness and desire to attempt a negotiated settlement agreement. Shortly thereafter, counsel for the plaintiff and counsel for the Federal Government reported to the Court that they had again negotiated a settlement agreement which they considered to be in the best interest of all of the parties. In this regard, the plaintiff's three counsel indicated that they would be submitting the negotiated settlement offer to their respective tribal governing bodies. However, on September 17, 1982, the plaintiff's counsel again reported, at a status conference with the Court, that they were still having difficulty in getting the tribal governing bodies to consider the negotiated settlement offer. In other words, several of the tribal governing bodies simply refused to consider or to respond to the second negotiated settlement offer. Thus, the proposed settlement agreement was again dead in the water.

At a later status conference, held June 6, 1983, counsel advised the Court that, although they had worked out a settlement figure, they could not settle the case without approval of the tribal bodies. The Court responded that counsel should at-

tempt to stipulate to the facts and/or figures contained in the negotiated settlement agreement. However, counsel indicated that they could not accomplish such a stipulation, since the various tribal councils could not agree on any type of settlement. Since May of 1982, therefore, a negotiated settlement offer, without time limit for acceptance, has been, and is still, outstanding. *See Sioux Tribe of Indians v. United States*, No. 74 (Cl.Ct. Nov. 10, 1983) (Order).

On October 21, 1983, this Court issued its Order Regarding Settlement Offer. *Sioux Tribe of Indians v. United States*, 3 Cl.Ct. 536 (1983). The order directed the plaintiff's counsel to formally present the negotiated settlement offer to the eight reservation tribes of the Sioux Nation. The order further directed the respective tribal governing bodies to consider the offer of settlement and to act on such offer according to the laws and constitution of their particular tribes. Decisions were to be communicated in writing to their respective legal counsel, who, in turn, would inform the Court of the plaintiff's decision.

The plaintiff's compliance and response to this Court's October 21, 1983, order, and its supplementary orders, indicate both the lack of consensus between the eight reservation tribes and the resulting quagmire into which the Docket 74 claims have fallen. Two of the reservation tribes accepted the settlement offer outright. Four of the reservation tribes rejected the settlement offer, since it did not include the return of their tribal land—relief over which this Court has no jurisdiction. These four tribes have also indicated their desire to withdraw from this litigation, since they are interested in recovering their land rather than in recovering a monetary award. Finally, two reservation tribes rejected the

proposed settlement offer without any explanation except that the offer was inadequate.

### Discussion

The chaos into which the plaintiff's claim has evolved is not unusual for cases filed pursuant to the Indian Claims Commission Act, 60 Stat. 1049 (1946), *codified at* 25 U.S.C. § 70 *et seq.* (1976). Prior to the Indian Claims Commission Act, Indian treaty claims against the Federal Government were effectively barred from being presented to the Court of Claims. House Committee on Indian Affairs, H.R.Rep. No. 1466, 79th Cong. 2d Sess. 2, *reprinted in* 1946 U.S.Code Cong. & Ad.News 1347, 1348. *See also* Act of March 3, 1863, ch. 92, § 9, 12 Stat. 765, 767;[6] *Temoak Band of Western Shoshone Indians, Nevada v. United States*, 219 Ct.Cl. 346, 357, 593 F.2d 994, 1000, *cert. denied*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979).

Indians wishing to commence litigation had to petition Congress for a statute granting jurisdiction. The process was a nightmare of procedural obstacles and of constant delays, often resulting in a dismissal on the basis that the issues being litigated exceeded the scope of the jurisdictional statute. H.R.Rep. No. 1466, *supra*, at 1352–53; *White Mountain Apache Tribe of Arizona v. United States*, 6 Cl.Ct. 575, 583–84 (1984); *Otoe and Missouria Tribe of Indians v. United States*, 131 Ct.Cl. 593, 604, 131 F.Supp. 265, 272, *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955).[7] Little judicial relief was thus available to Indian tribes for the Federal Government's past treaty violations. H.R. Rep. No. 1466, *supra*, at 1352–53; *White Mountain Apache Tribe of Arizona v. United States, supra*, 6 Cl.Ct. at 583–84;

---

**6.** The Act of March 3, 1863, provides in pertinent part that the Court of Claims' jurisdiction "shall not extend to or include any claim against the Government * * * growing out of or dependent on any treaty stipulation entered into with * * * the Indian tribes." Act of March 3, 1863, ch. 92, § 9, 12 Stat. 765, 767.

**7.** *See also Blackfeather v. United States*, 190 U.S. 368, 23 S.Ct. 772, 47 L.Ed. 1099 (1903); *See generally* Cowen, Nichols and Bennett, The United States Court of Claims—A History Part II: Origin—Development—Jurisdiction 1855–1978, 216 Ct.Cl. 1, 100 (1978); *Indian Breach of Trust Suits: Partial Justice in the Court of the Conqueror*, 33 Rutgers L.Rev. 502, 509–19 (Winter 1981).

*Otoe and Missouria Tribe of Indians v. United States, supra,* 131 Ct.Cl. at 604, 131 F.Supp. at 272.

In order to correct this situation, Congress passed the Indian Claims Commission Act, 60 Stat. 1049 (1946), *codified at* 25 U.S.C. § 70 *et seq.* (1976), which provided a forum in which Indian tribes could seek financial redress and final settlement of any and all historical treaty claims against the Federal Government. H.R.Rep. No. 1466, *supra,* at 1347–49; *White Mountain Apache Tribe of Arizona v. United States, supra,* 6 Cl.Ct. at 583–84; *Temoak Band of Western Shoshone Indians v. United States, supra,* 219 Ct.Cl. at 354, 593 F.2d at 998. The legislative history, preceding the enactment of the Indian Claims Commission Act, clearly reflects the congressional intent to provide Indian tribal members with access to this nation's courts:

> The bill in its present form is primarily designed to right a continuing wrong to our Indian citizens for which no possible justification can be asserted. Today any white man who has supplied goods or services to the United States under contract may, if the United States has failed to carry out its part of the bargain, go into the Court of Claims, or, in certain cases, into the Federal district courts, and secure a full, free, and fair hearing on his claims against the government. This is an integral part of the American system of justice under which the humblest citizen and the highest official are equal before the law. The only American citizen today who is denied such recourse to the courts is the Indian.

H.R.Rep. No. 1466, *supra,* at 1347–48.

Conceived as a temporary, quasi-judicial tribunal, the Indian Claims Commission was to hear and to decide all of the Indian claims cases before its 1956 expiration date. However, between 1946 and 1951, Indian tribes filed more than 370 petitions, covering 617 dockets. United States Indian Claims Commission Final Report, at 5, 7–8 (Sept. 30, 1978). This forced Congress to extend the Commission's life several times to accommodate the numerous trials

and resulting complexities. Cowen, Nichols and Bennett, The United States Court of Claims—A History Part II: Origin—Development—Jurisdiction 1855–1978, 216 Ct.Cl. 1, 100 (1978). Before its demise in 1978, the Commission awarded tribal members over $800 million in judgments. United States Indian Claims Commission Final Report, *supra,* at 21. Due to the age and complexities inherent in Indian tribal cases, coupled with the necessarily ponderous and laborious litigation procedures, Indian claim cases bogged down, often taking more than thirty years to reach a final resolution. United States Indian Claims Commission Final Report, *supra,* at 6–19. *See, e.g., Oneida Nation of New York v. United States,* 231 Ct.Cl. 990 (1982) (order granting motions to dismiss); *Navajo Tribe of Indians v. United States,* 220 Ct.Cl. 360, 367–68, 601 F.2d 536, 540 (1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980); *Temoak Band of Western Shoshone Indians, Nevada v. United States, supra,* 219 Ct.Cl. at 353, 593 F.2d at 998. Upon expiration of the Commission's statutory existence, all of its pending cases were transferred to this Court's predecessor, the Court of Claims. By September 30, 1978, the Indian Claims Commission had transferred 170 cases to the Court of Claims. Court of Claims History, *supra,* 216 Ct.Cl. at 100.

At this time, the instant litigation has devolved into an uncontrolled quagmire. Counsel for the plaintiff, after negotiating a fair and equitable settlement of this case, were unable to effectively present the offer to the reservation tribes without a court order directing the reservation tribe's to consider the offer. The simple fact that four of the reservation tribes are refusing to accept any settlement or award of this Court, which does not include the return of their land, is indicative of the plaintiff's refusal to comprehend, after 35 years of litigation, that this Court can only award money judgments.

As a result, this Court is now faced with eight reservation tribes which lack any apparent cohesion in the further prosecution

of this law suit. *See* Appendix I. This particular case is uniquely complicated in that, while there is only one plaintiff, the Sioux Nation, there are eight separate and distinct reservation tribes making up that plaintiff. In responding to this Court's Order Regarding Settlement Offer, the eight reservation tribes clearly demonstrated that they are unable to agree on the future course of this litigation. Half of the reservation tribes want to withdraw from the instant litigation, regardless of the possibility that they will never again be able to seek monetary compensation for their Docket 74 claims in this Court. Two of the reservation tribes recognize that further litigation is fruitless and are willing to accept the negotiated settlement offer, and the remaining two reservation tribes have refused the negotiated settlement offer even though continued litigation will result, in all probability, in their being awarded an amount roughly comparable to that of the settlement offer recently considered.

As a result, this Court can envision the continuation of this litigation *ad infinitum*. The eight reservation tribes have been unwilling to grasp and to comprehend the type of relief which this Court can award and to prosecute this case in a coordinated manner. Counsel for the reservation tribes, on the other hand, have been unable to accede to many of their clients' wishes, since they are aware of the limitations inherent in this Court's jurisdiction over this case. Thus, the case grinds its way slowly forward, regardless of the wishes of the plaintiff or of its attorneys, putting an ever increasing burden on the resources of this Court. It may well be that the past leaders of the current reservation tribes initiated this suit, some 35 years ago, for reasons that are no longer consistent with the wishes of the current tribal governing bodies. However that may be, some rational direction in this lawsuit must be given. *See* USCC Rule 1(a)(2), Rule 77(e), and Rule 77.1(a).

In response to this Court's Order Regarding Settlement Offer, the eight reservation tribes passed resolutions indicating their intentions regarding the continued prosecution of this case. *See* Final Status Report on Settlement Offer filed November 14, 1984 and attached hereto as Appendix I. Specifically, the eight tribal decisions are as follows:

### A. *Tribes Voting To Accept the Settlement*

(1) *The Crow Creek Sioux* Tribal Council, on April 10, 1984, in special session, voted unanimously, to accept the negotiated settlement offer in the amount of $39,-749,700. Tribal Resolution CC–84–04–10–02 (Apr. 10, 1984).

(2) The Tribal Council of the *Santee Sioux Tribe of Nebraska*, on October 9, 1984, passed Resolution 85–1, approving the settlement offer in the amount of $39,-749,700.

It is apparent that both the Crow Creek Sioux and the Santee Sioux recognize that continued litigation of this case is counterproductive and that the negotiated settlement offer reflects a fair and equitable solution to the continued litigation of this case. In both cases, counsel for these reservation tribes recommended that the tribal counsel accept the settlement offer. As a result, both of these reservation tribes voted to accept their proportionate share of the $39,749,700 offer and to terminate this litigation.

### B. *Tribes Seeking the Return of Their Land*

(3) The *Lower Brule Sioux* Tribal Council, in regular session, on April 20, 1984, passed Resolution Nos. 84–44, 84–45, 84–46 and 84–47, rejecting the negotiated settlement offer and directing its attorneys to "withdraw Docket 74 without prejudice to the Tribe and assist the Tribe in seeking the restoration of federal lands in the Black Hills and western South Dakota by legislation as a complete settlement for both Dockets 74 and 74B." [8]

---

**8.** Although the Indian Claims Commission separated into two dockets the lands affected by the

1868 Treaty (Docket 74) and those affected by the Act of Feb. 28, 1877, 19 Stat. 254, (Black

(4) The *Oglala Sioux* Tribal Council of the Pine Ridge Reservation, in regular session, on September 13, 1983, unanimously passed Resolution No. 83–160, which stated that its attorney "has no authority to represent the interests of the Oglala Sioux Tribe in Docket 74, and that it is the tribe's official position that Docket 74 be withdrawn from the Court of Claims and the tribe will seek a restoration of its 1868 Ft. Laramie lands either through court action or as a final legislative settlement for the Black Hills claims controversy." Resolution of the Oglala Sioux Tribal Council of the Oglala Sioux Tribe, No. 83–160 (Sept. 13, 1983). *See also* Resolution of the Oglala Sioux Tribal Council of the Oglala Sioux Tribe, No. 84–47 (Apr. 17, 1984), reaffirming the September 13, 1983 Resolution.

(5) *The Cheyenne River Sioux* Tribal Council, in special session, on October 15, 1984, passed Resolution No. 224–84–CR, declaring that the tribe reaffirms its "claim for the lands that are specified in Docket 74 and that this rejection of the monetary award shall not constitute abandonment of our claim [for that land]." Further, the Resolution unequivocally stated that "the award of the $44 million by the Court of Claims is not acceptable to the members of the Cheyenne River Sioux Tribe."

(6) *The Fort Peck Sioux* Council, on February 15, 1984, adopted Resolution No. 3–84–2, which accepted and approved the "offer made by the United States to settle for the entry of final judgment in the sum of $39,749,700 in Case No. 74 * * *." Resolution No. 3–84–2 was adopted by a vote of 64 to 11 in favor of accepting the settlement offer. However, on June 8, 1984, the Tribal Council passed resolution 8–84–6, rescinding "all prior actions taken by the Fort Peck Sioux Council concerning the

Black Hills Dockets 74 and 74–B * * *." In this second Resolution, the Fort Peck Sioux Council further expressed approval and support for "the coordinated assertion by the [Black Hills Steering Committee] member tribes of their claims to retain lands in the Black Hills and refuse compensation for the extinguishment of title to such lands in the Black Hills." Resolution 8–84–6 (June 8, 1984). Resolution No. 8–84–6 was approved by a vote of 21 to 0.

Between 1863 and 1946, virtually no form of treaty-related redress was available to Indian tribes. When, in 1946, the Indian Claims Commission was created, the award of a money judgment offered an Indian tribe's "only hope for justice." *Temoak Band of Western Shoshone Indians, Nevada v. United States, supra,* 219 Ct.Cl. at 350, 593 F.2d at 996. However, over the course of the last thirty-nine years, some Indian tribes have been advised that monetary compensation is insufficient and/or inappropriate, since a monetary award would be inconsistent or incompatible with their legal assertion of title to their ancestral land. Indeed, that is true. An Indian tribe cannot maintain an action for recovery of inadequate compensation given to the Indians for their ceded land, while also arguing that the same land was never ceded at all. These are classic mutually exclusive arguments. *Cf. United States v. Oneida Nation of New York,* 217 Ct.Cl. 45, 67 n. 26, 576 F.2d 870, 882 n. 26 (1978). In any event, these tribes now believe that justice requires that their original homeland should be returned to them along with, in some cases, monetary damages. *See Oneida Nation of New York v. United States, supra,* 231 Ct.Cl. at 990–91; *Temoak Band of Western Shoshone Indi-*

Hills case Docket 74–B), several of the reservation tribes consider and treat both dockets as part of the same claim. *See* Lower Brule Sioux Tribe, Resolution Nos. 84–44, 84–45, 84–46, and 84–47 (Apr. 20, 1984); Resolution of the Oglala Sioux Tribal Council, Resolution No. 83–160 (Sept. 13, 1983); Fort Peck Sioux Council Resolution # 8–84–6 (June 8, 1984).

Seven of the eight reservation tribes of Docket 74 and Docket 74–B have formed the Black Hills

Steering Committee (the Santee Sioux Tribe of Nebraska has apparently not joined the Committee). The Committee plans to draft proposed legislation that seeks the restoration of the Sioux tribal land at issue in both Docket 74 and Docket 74–B and to lobby the U.S. Congress for enactment of such legislation. *See* Lower Brule Sioux Tribe, Resolution 84–46 (April 20, 1984); Fort Peck Sioux Council, Resolution # 8–84–6 (June 8, 1984).

ans, *Nevada v. United States, supra,* 219 Ct.Cl. at 349, 350, 593 F.2d at 995, 996.

■■■ Unfortunately, this Court lacks jurisdiction to return such land to the Indians. Generally, the only suits over which this Court has jurisdiction are those in which the plaintiff seeks money damages, rather than the return of the disputed land itself. *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). This rule holds true even where the plaintiff brings its action under the Indian Claims Commission Act, 25 U.S.C. § 70 *et seq.* (1976). The legislative history indicates that Congress, in forming the Indian Claims Commission, contemplated only the award of money damages, rather than the return of the land itself. *See, e.g.,* 92 Cong.Rec. 5312 (1946) (statement of Rep. Henry M. Jackson).[9]

■■■ The Federal Government, as the sovereign, is immune from suit, unless it expressly consents to be sued. *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941); *United States v. Shaw,* 309 U.S. 495, 500-01, 60 S.Ct. 659, 661, 84 L.Ed. 888 (1940); *Minnesota v. United States,* 305 U.S. 382, 387, 59 S.Ct. 292, 294, 83 L.Ed. 235 (1939). Therefore, when the Federal Government consents to be sued, the "terms, conditions and qualifications of such consent must be scrupulously followed." *Coleman v. United States Bureau of Indian Affairs,* 715 F.2d 1156, 1161 (7th Cir.1983). *See United States v. Mitchell, supra,* 463 U.S. at 216-19, 103 S.Ct. at 2967-69; *United States v. Sherwood, supra,* 312 U.S. at 586-87, 61 S.Ct. at 769-70. *Temoak Band of Western Shoshone Indians, Nevada v. United*

States, *supra,* 219 Ct.Cl. at 354-55, 593 F.2d at 998-99. Congress may prescribe that the parties follow particular procedures, invoke particular tribunals, or pursue a specific remedy. *Coleman v. United States Bureau of Indian Affairs, supra,* 715 F.2d at 1161. *See Temoak Band of Western Shoshone Indians, Nevada v. United States, supra,* 219 Ct.Cl. at 354-55, 593 F.2d at 998-99.

In creating the Indian Claims Commission, Congress established a special tribunal capable of awarding only money damages as the appropriate measure of compensation. *Coleman v. United States Bureau of Indian Affairs, supra,* 715 F.2d at 1161 n. 37. *See* United States Indian Claims Commission Final Report, *supra,* at 8, 21. The very purpose of the Indian Claims Commission was to compensate Indian tribes for any inadequate compensation paid by the Federal Government for the Indians' ceded land, while protecting the interests of those presently possessed of that land. *Coleman v. United States Bureau of Indian Affairs, supra,* 715 F.2d at 1160. *See Indian Breach of Trust Suits: Partial Justice in the Court of the Conqueror, supra,* 33 Rutgers L.Rev. at 516-17. Indeed, the legislative history of the Indian Claims Commission Act reflected the congressional concern that the Indian tribes' lack of adequate compensation for their ceded land served as a barrier to tribal economic progress. H.R.Rep. No. 1466, *supra,* at 1351.

■■■ Thus, this Court clearly lacks jurisdiction to grant the principal relief sought by the Lower Brule Sioux Tribe, the Oglala Sioux Tribe, the Cheyenne River Sioux Tribe, and the Fort Peck Sioux Tribe. The parties cannot maintain an action in this Court which is inconsistent with this Court's jurisdiction. An action seeking the

---

9. Rep. Jackson, Chairman of the House Committee on Indian Affairs, stated, "[l]et us pay our debts to the Indian tribes that sold us the land that we live on. They sold it for little enough, generally a few cents an acre. Let us at least pay what we promised to pay, if we have

not already done so, and let us see that the Indians have their fair day in court so that they can call the various Government agencies to account on the obligations that the Federal Government assumed." 92 Cong.Rec. 5312 (1946).

return of their ancestral land must be maintained elsewhere.

Ordinarily, a plaintiff desiring relief which is unavailable in this Court would file a motion to dismiss the case, without prejudice, in order that other avenues of relief could be pursued. This, however, is anything but an ordinary case. Here, no such motions have been filed by the respective plaintiff's counsel. Even if such motions were filed on behalf of the above four reservation tribes, this Court would be forced to deny the motions. Since this case involves a single plaintiff, the Sioux Nation, the Court cannot allow any of the reservation tribes which make up the plaintiff to sever themselves from this litigation. If such severance was allowed, the remaining four reservation tribes would be entitled to share in the full land valuation amount ultimately awarded in this case. As such, they would be unjustly enriched, while the Indians making up the four withdrawing reservation tribes would be precluded from ever recovering any monetary award based on the claims raised in Docket 74. Thus, this Court believes that such dismemberment of the plaintiff would be impossible under the factual circumstances presented herein.

Moreover, to allow the withdrawal of some of the reservation tribes for the purpose of their seeking title to their land in another forum, while at the same time allowing the remaining reservation tribes to seek monetary compensation for the same ceded land, would be simply inappropriate as it would be putting this Court's imprimatur on an inconsistent legal theory. Only if all of the eight reservation tribes making up the plaintiff in this action agreed to move for a voluntary dismissal, without monetary compensation, would this Court grant such a motion.

### C. Tribes Rejecting the Settlement Offer

(7) The Rosebud Sioux Tribal Council, on April 30, 1984, passed Resolution No. 84–103, rejecting "the offer of the U.S. Government to settle Docket 74 out of court for $39,749,700." The Resolution further indicated that at least one of the reasons behind the reservation tribe's actions was the "injustice of U.S. government offsets" and in the interest of a fairer judgment, "the Rosebud Sioux Tribal Council must seek other options before a settlement is made on Docket 74." The Resolution does not reveal, however, what other options the tribe believes to exist. However, this Court notes that the Rosebud Sioux Tribe has also joined the Black Hills Steering Committee, evidencing an interest in bringing about the eventual return of their ancestral homeland.

(8) The Standing Rock Sioux Tribal Council, on April 24, 1984, passed Resolution No. 89–84, rejecting and disapproving the Government's offer to settle, with no further indications as to its intentions in pursuing further litigation in this case. Again, it is noted, however, that the Standing Rock Sioux have also joined the Black Hills Steering Committee, thereby evidencing its interest in pursuing a course of action that seeks the return of its ancestral homeland. Additionally, on May 1, 1984, this Court received a mailgram signed by eleven members of the Upper and Lower Yanktonai Bands of the Standing Rock Sioux reservation. The signatories stated that they refused to submit to the Court's Order Regarding Settlement Offer. Sioux Tribe of Indians v. United States, 3 Cl.Ct. 536 (1983). Further, those signing the mailgram sought to withdraw from the litigation in order to pursue restoration of the 1868 Ft. Laramie Treaty land. While this transmission may indicate the reasons underlying the Standing Rock tribe's rejection of the settlement offer, those signing the mailgram appear to hold no official position and appear to lack authority to speak for the 5,000 tribal members.

While the Rosebud Sioux Resolution refers to that reservation tribe's desire to obtain a fairer judgment, this Court is unable to conceive of a potentially fairer judgment. As discussed herein, the negotiated settlement offer reflects an amount which this Court believes would be roughly comparable to the resulting final award after

further extensive litigation. In fact, as mentioned *infra*, this Court believes that the negotiated settlement offer will result in more money to the reservation tribes, than if this litigation is allowed to continue.

In any event, this Court is forced to consider the Rosebud Sioux Resolution and the Standing Rock Sioux Resolution as reflecting these reservation tribes' hope that a final termination of this litigation will include the return of their tribal land. However, as discussed above, this Court has no jurisdiction to award such relief.

### Alternatives

In view of the above discussion, this Court is now confronted with three alternative courses of action:

(1) Allow the instant litigation to proceed to its final conclusion, culminating in an award of a money judgment. This is an alternative that could well take many years of further litigation and require a majority of the reservation tribes to participate in an action which they no longer wish to maintain. Further, the ultimate result of such continued litigation will undoubtedly be the award of money damages roughly comparable to the negotiated settlement offer;

(2) Dismiss the instant litigation for lack of jurisdiction, based upon a majority of the reservation tribes demanding the return of their tribal land in addition to money damages and thus constructively moving for a voluntary dismissal of this action. This alternative seems grossly unfair to the remaining reservation tribes, who, after some 35 years, are willing to accept a money judgment as full compensation for their claims; or

(3) Terminate the instant litigation and enter a fair and equitable money judgment in favor of the plaintiff.

■ This Court views the latter alternative to be the most fair and equitable solution. Six of the eight reservation tribes have indicated that they no longer wish to go forward with this litigation (*i.e.*, two reservation tribes indicated that they wish to accept the negotiated settlement offer and four reservation tribes indicated that they wish to withdraw from this litigation to seek the eventual return of the tribal land ceded under the 1868 Treaty). Since, therefore, six of the eight reservation tribes have specifically indicated that they no longer wish to litigate the instant case further, the majority must rule, and the litigation should properly be terminated.

After considering all of the voluminous evidence before it, this Court believes that the negotiated settlement reached by counsel for both parties in this case represents a fair and equitable monetary amount to be awarded the plaintiff.[10] Therefore, judgment is hereby entered in the plaintiff's favor in the amount of $39,749,700, representing an amount which the plaintiff's counsel and the Federal Government's counsel agreed upon and which this Court believes constitutes fair and equitable compensation in full satisfaction of the plaintiff's claims in this case. Truly, this case fits Sir Winston Churchill's famous quotation uttered in a radio broadcast on October 1, 1939: "It is a riddle wrapped in a mystery inside an enigma." *See* Bartlett, J.,

10. The negotiated settlement offer is $39,749,700. The plaintiff's interlocutory land valuation award is $43,949,700. As a result of this Court's decision in Summary Judgment Opinion—III, the Federal Government is entitled to $2,669,762.20 in offsets for land inadvertently transferred to the plaintiff under the 1868 Treaty. *The Sioux Tribe of Indians v. United States*, 7 Cl.Ct. 481 No. 74 (Cl.Ct.1985) (Summary Judgment Opinion—III). After reducing the plaintiff's land valuation award by such offset, the plaintiff is now entitled to $41,279,937.80. The difference between this amount and the negotiated settlement award is some $1.5 million. However, the Federal Government is still entitled to an opportunity to prove a number of additional offsets, amounting potentially to some $56 million, which could conceivably reduce the land valuation award, to which the plaintiff is entitled, below that of the proposed negotiated settlement offer. Further, this Court would note that the interest alone, on an award of $39,749,700, will almost exceed the $1.5 million difference in the first year alone. As a result, further litigation of this case will only result in the plaintiff effectively recovering less money than is currently being awarded by this Court.

*Familiar Quotations,* 15th Ed., Little, Brown & Co., at 743.

The Court of Claims, in handling numerous Indian Claims, lamented the delay inherent in moving such cases toward resolution and imposed upon its trial judges an obligation "to expedite these cases, and to take all necessary steps to ensure their speedy determination." *Navajo Tribe of Indians v. United States, supra,* 220 Ct.Cl. at 367–68, 601 F.2d at 540. *See Minnesota Chippewa Tribe v. United States,* 227 Ct.Cl. 538, 542 (1981); *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 180, 624 F.2d 981, 985 (1980); *Temoak Band of Western Shoshone Indians, Nevada v. United States,* 219 Ct.Cl. at 354–55, 593 F.2d at 998–99. *See also Short v. United States,* 719 F.2d 1133, 1143 (Fed. Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984); *Short v. United States,* 228 Ct.Cl. 535, 547–48, 661 F.2d 150, 157–58 (1981), *cert. denied,* 455 U.S. 1034, 102 S.Ct. 1738, 72 L.Ed.2d 153 (1982); *White Mountain Apache Tribe of Arizona v. United States,* 5 Cl.Ct. 288, 293 (1984); *White Mountain Apache Tribe of Arizona v. United States,* 4 Cl.Ct. 575, 581 (1984); *Hoopa Valley Tribe of Indians v. United States,* 4 Cl.Ct. 656, 657–58 (1984).

The Court of Claims, in directing its trial judges to expedite the resolution of long litigated Indian claims cases, called for the use of innovative procedures whenever necessary to resolve cases in a reasonable time. *Navajo Tribe of Indians v. United States, supra,* 220 Ct.Cl. at 367–68, 601 F.2d at 540. In particular, Judge Davis stated that:

> The objective should always be to conclude the litigation as speedily and simply as feasible, without needless or burdensome steps or complications * * *. As Chief Judge Friedman said in *Navajo Tribe, supra,* [220 Ct.Cl. 360, 601 F.2d 536 (1979)]: "There is a need for innovative handling and treatment, perhaps to devise new procedures that will end the delays that have plagued these cases for so many years. We have faith in the ability of the trial judges to develop such techniques."

*Navajo Tribe of Indians v. United States, supra,* 224 Ct.Cl. at 180, 624 F.2d at 985 (citations omitted).

Recently, Judge Nettesheim imposed a settlement offer upon the plaintiff tribe as a sanction for lack of prosecution. *See White Mountain Apache Tribe of Arizona v. United States, supra.* In that case, after the plaintiff repeatedly refused to obey the Court's orders, Judge Nettesheim imposed a judgment, on the plaintiff's behalf, in an amount equalling approximately three-fourths of the Government's settlement offer. *See also Short v. United States, supra,* 228 Ct.Cl. at 547–48, 661 F.2d at 157–58 (1981) (the Court formulated standards normally initiated by the trial judge in order to expedite the resolution of a twenty-year old case).

The instant case, however, differs significantly from the settlement offer decision imposed upon the White Mountain Apache tribe by Judge Nettesheim. Here, the plaintiff, after some significant judicial prodding, has complied with this Court's orders. In addition, this Court is not awarding the plaintiff the Federal Government's proposed settlement offer, but, rather, the plaintiff's own counsels' negotiated settlement offer. Further, while Judge Nettesheim imposed the Federal Government's settlement offer as a sanction, this Court is imposing the negotiated settlement offer neither as a sanction nor as a settlement offer *per se,* but simply as the Court's considered judgment as to what would be fair and equitable compensation for the Sioux tribal land ceded under the 1868 Treaty. *See* USCC Rule 1(a)(2), Rule 77(e), and Rule 77.1(a).

In this Court's view, the negotiated settlement offer is fair and reasonable to all concerned. Indeed, counsel for the plaintiff have advised all of the reservation tribes to accept the negotiated settlement offer on many separate occasions. Further prosecution of this case would, in all probability, result in equivalent compensation for the plaintiff, while, at the same time, forc-

ing those reservation tribes who desire to withdraw from this litigation to involuntarily continue litigating.

■ As a general rule, this Court lacks general equity jurisdiction. *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967). However, the Indian Claims Commission Act established jurisdiction over:

(1) claims in law or *equity* arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or *equity*, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a *court of equity;* (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or *equity.*

25 U.S.C. § 70a (1976) (emphasis added). Thus, this Court, standing in the shoes of the now defunct Indian Claims Commission, has acquired the equitable powers originally conferred on the Commission. As a result, after careful consideration of its responsibilities as a court of law and of equity, this Court feels compelled, in the interests of both justice and equity, to terminate this litigation and to impose the negotiated settlement offer as a final judgment and as a final solution to this case. *See also* USCC Rules 1(a)(2), 77(e) and 77.-1(a).

The lack of cohesion among the eight reservation tribes has caused this litigation to lose its way. Four of the respective reservation tribes have passed tribal resolutions stating that they wish to withdraw from the instant case, since they are unwilling to accept any judgment of this Court that does not order the return of their land. Such relief is clearly beyond the scope of this Court's jurisdiction. Two of the tribes want this Court to approve the negotiated settlement offer, and two of the tribes have rejected the settlement offer. Thus, after 35 years of litigation, six of the eight reservation tribes are willing to admit that they want an end to this litigation. The remaining two reservation tribes are apparently unwilling or unable to clearly define their reasons for continuing this litigation. Under these circumstances, this Court has decided, after much consideration, to bring an end to this litigation. In all judicial fairness and equity, this Court can see no good reason for allowing this case to proceed.

It is sincerely hoped that bringing this matter to a close with a fair and equitable money judgment will assist the Sioux Nation in ending the turmoil in their midst and in directing their future energies to developing a productive and healthful tribal environment.

## CONCLUSION

For the reasons discussed above, this Court hereby directs the Clerk to enter final judgment for the plaintiff in the amount of $39,749,700, in full and complete satisfaction of all of the plaintiff's claims against the Federal Government which have been raised in Docket 74 and in full and complete satisfaction of all of the Federal Government's offset claims against the plaintiff herein.

IT IS SO ORDERED.

## APPENDIX I

### FINAL STATUS REPORT ON SETTLEMENT OFFER

Pursuant to the Court's order of August 29, 1984 (the "August Order"), as supple-

mented on September 13, 1984 (the "September Order"), plaintiffs' counsel report as follows:

(1) Counsel forwarded a copy of the August Order to the Chairman (or President) and Secretary of the governing body of each Sioux tribal plaintiff which had not previously accepted the Government's settlement offer by certified mail, return receipt requested, under date of September 14, 1984.* Copies of these seven communications are attached as Exhibits A–1 to A–7, inclusive. Copies of the relevant return receipts are attached as Exhibit B.**

(2) The actions taken by the eight plaintiff Sioux Tribes with respect to the Government's proposed settlement are as follows:

a. *Cheyenne River Sioux Tribe:* On October 15, 1984, the Cheyenne River Sioux Tribal Council voted to reject the settlement offer, while affirming "that this rejection of the monetary award shall not constitute abandonment of our claim." Copies of Resolution No. 224–84–CR evidencing this decision and the Tribal Secretary's accompanying memorandum are attached as Exhibit C.

b. *Crow Creek Sioux Tribe:* As reported in counsel's Second Status Report on Settlement Offer, and as noted in the August Order at p. 2, the Crow Creek Sioux Tribe has voted to accept the Government's offer. As required by the September Order, another copy of Council Resolution CC–84–04–10–02 evidencing this decision is attached as Exhibit D. As far as counsel is aware, the Crow Creek Sioux Tribe has not reconsidered its original decision (*see* Note *, p. 1). Since the Tribe complied with the Court's Order of October 21, 1983 (the "October Order"), the provisions of the August

Order do not seem to mandate reconsideration (*see* p. 3: *"may"* instead of *"shall"*).

c. *Lower Brule Sioux Tribe:* Under date of October 15, 1984, the Chairman of the Lower Brule Sioux Tribe forwarded to counsel copies of four resolutions dealing with Docket Nos. 74 and 74–B, all dated April 20, 1984, together with a copy of a letter to counsel dated April 25, 1984, none of which previously had been received or seen by counsel. Resolution No. 84–47 recites, *inter alia,* that "the Lower Brule Sioux Tribe hereby rejects the Government's offer in Docket 74." The aforementioned letters and resolutions, together with copies of counsel's response (plus a reminder letter dated October 19, 1984) are attached as Exhibits E–1 to E–8, inclusive.

d. *Oglala Sioux Tribe:* As reported in counsel's Second Status Report on Settlement Offer, and as noted in the August Order at p. 2, the Oglala Sioux Tribe has voted to reject the Government's offer. As required by the September Order, additional copies of the papers evidencing this decision are attached as Exhibit F. As far as counsel is aware, the Oglala Sioux Tribe has not reconsidered its original decision. Since the Tribe already had complied with the October Order, the provisions of the August Order (p. 3) did not appear to mandate reconsideration.

e. *Rosebud Sioux Tribe:* In response to counsel's letter of September 14, 1984, forwarding the August Order, the Superintendent of the Rosebud Agency transmitted a copy of Resolution No. 84–103 of the Rosebud Sioux Tribe, dated April 30, 1984, which recites, *inter alia,* that "the Rosebud Sioux Tribal Council hereby rejects the offer of the U.S. Government to settle Docket 74...." A copy of Resolution No. 84–103 is attached as Exhibit G. This doc-

---

* As noted in the August Order at p. 2, the Crow Creek Sioux Tribe already had accepted the settlement offer and, accordingly, further correspondence thereon did not initially appear either necessary or appropriate. Upon more recent rereading of the September Order, however, counsel realized that the Court had not excepted Crow Creek from the plaintiff tribes to which the August Order was to be sent and, therefore, it has been so communicated. A

copy of counsel's transmittal letter is attached as Exhibit A–8.

** A return receipt was not received from the Sioux Tribe of the Fort Peck Reservation. As noted in the text at p. 4, *infra,* however, the Fort Peck Sioux in fact did respond to counsel's letter of September 14, 1984.

ument confirms the oral advice given to counsel by the President of the Rosebud Sioux Tribe shortly after passage of the resolution, as reported in counsel's Second Status Report on Settlement Offer; a copy of the written resolution should have been, but unfortunately was not, earlier forwarded to counsel by the BIA agency office.

f. *Santee Sioux Tribe:* On October 9, 1984, the Santee Sioux Tribe voted to accept the Government's settlement offer. Copies of Resolution No. 85–1 of the Santee Sioux Tribal Council evidencing this decision, together with further correspondence from counsel, are attached as Exhibit H.

g. *Sioux Tribe of the Fort Peck Reservation:* As stated in counsel's Second Status Report on Settlement Offer, as supplemented by the Third Status Report, the Sioux Tribe of the Fort Peck Reservation initially voted to accept the Government's offer. As required by the September Order, another copy of the Fort Peck Sioux Resolution No. 3–84–2 evidencing that decision is attached as Exhibit I–1. Under date of September 25, 1984, the Chairman of the Fort Peck Sioux Council sent counsel a copy of Resolution No. 8–84–6, dated June 8, 1984, rescinding the foregoing action. Copies of the Chairman's letter and the June 8 resolution are attached as Exhibit I–2. Counsel understands that, at a Council meeting held on October 20, 1984, the Fort Peck Agency Superintendent stated that the Bureau of Indian Affairs considers Resolution No. 8–84–6 to be valid and to reflect the current views of the Fort Peck Sioux.

h. *Standing Rock Sioux Tribe:* As reported in counsel's Third Status Report on Settlement Offer, and as noted in the August Order at p. 2, the Standing Rock Sioux Tribe has voted to reject the Government's offer. As required by the September Order, an additional copy of Standing Rock Sioux Tribal Council Resolution 89–84 evidencing this decision is attached as Exhibit J. As far as counsel is aware, the Standing Rock Sioux Tribe has not reconsidered its original decision. Since the Tribe already had complied with the October Order, the provisions of the August Order (p. 3) did not appear to mandate reconsideration.

(3) In light of the foregoing information, counsel submit that all eight Sioux Tribes have acted upon the Government's settlement offer in this case, that the Tribes have expressed their respective decisions in *writings* which have been transmitted to the Court and thus that plaintiffs have fully complied with the Court's orders.

Respectfully submitted,
/s/ Arthur Lazarus, Jr.
Arthur Lazarus, Jr., P.C.
Fried, Frank, Harris, Shriver & Kampelman
600 New Hampshire Avenue, N.W.
Suite 1000
Washington, D.C. 20037
Attorney of Record
for Plaintiffs

November 13, 1984

EXHIBIT A–1

FRIED, FRANK, HARRIS, SHRIVER & KAMPELMAN

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

SUITE 1000

600 NEW HAMPSHIRE AVENUE, N.W.

WASHINGTON, D.C. 20037

(202) 342–3500

CABLE "STERIC WASHINGTON"

TELEX 892406

September 14, 1984

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Morgan Garreau
Chairman
Cheyenne River Sioux Tribe
P.O. Box 590
Eagle Butte, South Dakota 57625

RE: *Docket No. 74 (1868 Treaty Case)*

Dear Chairman Garreau:

For your information and appropriate action, I am enclosing an Order entered by the United States Claims Court on August 29, 1984, with respect to the Government's outstanding offer of settlement in the 1868 Treaty case (Docket No. 74).

As you will note, the Court is aware that the Cheyenne River Sioux Tribe, by letter dated May 3, 1984, asked for additional time during which to consider the proposed settlement. Judge Yock, in effect, has granted that request and has given the Tribe until November 1, 1984, to make a decision on whether to accept or reject the Government's offer and to communicate that decision in writing to its counsel.

I am writing to urge, as the Court has directed, that you again present the question of settlement to the Cheyenne River Sioux Tribal Council and that a decision be reached one way or the other. Please then send a copy of the Council's resolution—which can be as simple as a statement that the settlement offer in Docket No. 74 is either accepted or rejected—to me so that I may transmit a copy to the Court. *It is important that this procedure be followed* because Judge Yock has stated that "sanctions will be imposed in the event this second order of the Court, regarding the pending settlement offer, is not complied with." (Order, p. 3.)

I look forward to hearing from you on this matter in the near future. If you have any questions, please feel free to call me.

With kind regards.

 Sincerely yours,
 /s/ Arthur Lazarus
 Arthur Lazarus, Jr., P.C.

 EXHIBIT A–2

LAW OFFICES

SONOSKY, CHAMBERS, SACHSE & GUIDO

1050 31st STREET, N.W.

WASHINGTON, D.C. 20007

September 14, 1984

Mr. Patrick Spears
Chairman
Lower Brule Sioux Tribal Council
Lower Brule, South Dakota 57548

Re: *Docket No. 74 (1868 Treaty case)*

Dear Mr. Spears:

For your information and appropriate action, I am enclosing an order entered by the United States Claims Court on August 29, 1984 with respect to the Government's outstanding offer of settlement in the 1868 Treaty case (Docket No. 74).

The opening paragraph of the order points out that the October 31, 1983 order of the Court "required that a final decision for or against the pending offer of settlement *shall be made* and will be communicated in writing" to the attorney by the Tribal Council.

At page 2 of the enclosed order the Court acknowledges that the attorney had advised the Court that your Tribe had orally informed me that the offer had been rejected.

At page 3 of the enclosed order the Court notes that the Lower Brule Tribe is in default for failure to communicate its decision on the settlement *in writing.* The Court then directs that the Tribe *shall,* or or before November 1, 1984, consider the offer of settlement and make a decision for or against the offer of settlement and communicate that decision in writing to me.

I am writing to urge, as the Court has directed, that the Tribal Council again consider the offer and that a decision be reached one way or the other. Please then send a copy of the Council's resolution—which can be as simple as a statement that the settlement offer in Docket No. 74 is either accepted or rejected—to me so that I may file a copy with the Court by November 1, 1984, the deadline imposed by the Court. *It is important that this procedure be followed* because Judge Yock has stated that "sanctions will be imposed in the event this second order of the Court, regarding the pending settlement offer, is not complied with" including the sanction of dismissal of the case as to your Tribe. (Order, p. 3.) Other sanctions could include a daily monetary charge against the Tribe.

Best personal regards,
Sincerely,
/s/ Marvin J. Sonosky
Marvin J. Sonosky

MJS/jbc

Enclosure

cc: Mr. William Ziegler, Secretary-Treasurer

Superintendent

CERTIFIED MAIL NO. 0818783
RETURN RECEIPT REQUESTED

EXHIBIT A–3

FRIED, FRANK, HARRIS, SHRIVER
& KAMPELMAN

A PARTNERSHIP INCLUDING
PROFESSIONAL CORPORATIONS

SUITE 1000

600 NEW HAMPSHIRE AVENUE, N.W.

WASHINGTON, D.C. 20037

(202) 342–3500

CABLE "STERIC WASHINGTON"

TELEX 892406

September 14, 1984

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Newton Cummings
President
Oglala Sioux Tribe
Box 468
Pine Ridge, South Dakota 57770

RE: *Docket No. 74 (1868 Treaty Case)*

Dear President Cummings:

For your information and appropriate action, I am enclosing an Order entered by the United States Claims Court on August 29, 1984, with respect to the Government's outstanding offer of settlement in the 1868 Treaty case (Docket No. 74).

As you will note, the Court is aware that the Oglala Sioux Tribe has rejected the proposed settlement, as evidenced by a letter dated April 27, 1984, and enclosed resolution, signed by Vice President John Steele and filed with the Clerk of the Court. Judge Yock, however, has granted those four tribes which already have complied with his prior order, including the Oglala Sioux Tribe, until November 1, 1984, "to reconsider or to otherwise communicate their intentions regarding this lawsuit." (Order, p. 3.)

In short, the Court has provided that the Oglala Sioux Tribe *may* wish to reconsider its prior action and that its decision on whether to do so and, if so, the result should be communicated in writing to counsel before November 1, 1984. Accordingly, I look forward to hearing from you before that date. In the interim, if you have any questions, please feel free to call upon me.

With kind regards.
Sincerely yours,
/s/ Arthur Lazarus, Jr.
Arthur Lazarus, Jr., P.C.

EXHIBIT A–4

LAW OFFICES

SONOSKY, CHAMBERS, SACHSE & GUIDO

1050 31ST STREET, N.W.

WASHINGTON, D.C. 20007

September 14, 1984

Mr. Webster Two Hawk
President
Rosebud Sioux Tribal Council
White River, South Dakota 57579

Re: *Docket No. 74 (1868 Treaty case)*

Dear Mr. Two Hawk:

For your information and appropriate action, I am enclosing an order entered by the United States Claims Court on August 29, 1984 with respect to the Government's outstanding offer of settlement in the 1868 Treaty case (Docket No. 74).

The opening paragraph of the order points out that the October 31, 1983 order of the Court "required that a final decision for or against the pending offer of settlement *shall be made* and will be communicated in writing" to the attorney by the Tribal Council.

At page 2 of the enclosed order the Court acknowledges that the attorney had advised the Court that your Tribe had orally informed me that the offer had been rejected.

At page 3 of the enclosed order the Court notes that the Rosebud Tribe is in default for failure to communicate its decision on the settlement *in writing.* The Court then directs that the Tribe *shall,* on or before November 1, 1984, consider the offer of settlement and make a decision for or against the offer of settlement and communicate that decision in writing to me.

I am writing to urge, as the Court has directed, that the Tribal Council again consider the offer and that a decision be reached one way or the other. Please then send a copy of the Council's resolution—which can be as simple as a statement that the settlement offer in Docket No. 74 is either accepted or rejected—to me so that I may file a copy with the Court by November 1, 1984, the deadline imposed by the Court. *It is important that this procedure be followed* because Judge Yock has stated that "sanctions will be imposed in the event this second order of the Court, regarding the pending settlement offer, is not complied with" including the sanction of dismissal of the case as to your Tribe. (Order, p. 3.) Other sanctions could include a daily monetary charge against the Tribe.

Best personal regards,

Sincerely,

/s/ Marvin J. Sonosky

Marvin J. Sonosky

MJS/jbc

Enclosure

cc: Mr. Lloyd One Star, Sr., Secretary
Superintendent, Rosebud Agency

CERTIFIED MAIL NO. 0818782
RETURN RECEIPT REQUESTED

EXHIBIT A-5

LAW OFFICES

SONOSKY, CHAMBERS, SACHSE & GUIDO

1050 31ST STREET, N.W.

WASHINGTON, D.C. 20007

September 14, 1984

Mr. Richard L. Kitto
Chairman
Santee Sioux Tribal Council
Niobrara, Nebraska 68760

Re: *Docket No. 74 (1868 Treaty case)*

Dear Mr. Kitto:

For your information and appropriate action, I am enclosing an order entered by the United States Claims Court on August 29, 1984 with respect to the Government's outstanding offer of settlement in the 1868 Treaty case (Docket No. 74).

The opening paragraph of the order points out that the October 31, 1983 order of the Court "required that a final decision for or against the pending offer of settlement *shall be made* and will be communicated *in writing* ".

At page 2 of the enclosed order the Court acknowledges that your attorney has advised the Court that he had not been able to ascertain if any action had been taken on the settlement offer.

At page 3 of the enclosed order the Court notes that the Santee Tribe is in default for failure to communicate its decision on the settlement in writing. The Court then directs that the Tribe *shall,* on or before November 1, 1984, consider the offer of settlement and make a decision for or against the offer of settlement and communicate that decision in writing, to me.

I am writing to urge, as the Court has directed, that the Tribal Council again consider the offer of settlement and that a decision be reached one way or the other. Please then send a copy of the Council's resolution—which can be as simple as a statement that the settlement offer in Docket No. 74 is either accepted or rejected—to me so that I may file a copy with the Court by November 1, 1984, the deadline imposed by the Court. *It is important that this procedure be followed* because Judge Yock has stated that "sanctions will be imposed in the event this second order of the Court, regarding the pending settlement offer, is not complied with", including the sanction of dismissal of the case as to your Tribe. (Order, p. 3.) Other sanctions could include a daily monetary charge against the Tribe.

Best personal regards,

 Sincerely,

 /s/ Marvin J. Sonosky

 Marvin J. Sonosky

MJS/jbc

Enclosure

cc: Mr. Clement Mackey, Secretary
 Superintendent

CERTIFIED MAIL NO. 0818699
RETURN RECEIPT REQUESTED

## EXHIBIT A–6

LAW OFFICES

SONOSKY, CHAMBERS, SACHSE & GUIDO

1050 31ST STREET, N.W.

WASHINGTON, D.C. 20007

September 14, 1984

Mr. Albert Comeslast

Chairman

Sioux of the Fort Peck Indian Reservation

Poplar, Montana 59255

Re: *Docket No. 74 (1868 Treaty case)*

Dear Mr. Comeslast:

For your information and appropriate action, I enclose an order entered by the United States Claims Court on August 29, 1984, with respect to the Government's outstanding offer of settlement in the 1868 Treaty case (Docket No. 74).

The Court's order recites (p. 2) that as evidenced by Resolution No. 3–84–2, adopted February 15, 1984, the Sioux of the Fort Peck Reservation accepted the offer of settlement. I have heard that a subsequent meeting was called at which the February 15, 1984 action was reversed and the offer rejected. I have never received any resolution or other documentation of the second meeting. I have heard, also, that the legality of the second meeting and the validity of its action have been called into question. Because I received no documentation of any action of the second meeting, no report of the second meeting has been made to the Court.

In these circumstances I should like to be advised of the facts concerning the second meeting. If the Bureau will certify that the action of the first meeting is recognized and the action of the second meeting is not recognized, nothing further need be done. If the Bureau will not so certify, I urge that another meeting of the Sioux General Council be properly convened, that the offer again be considered and that a decision on the offer of settlement be reached one way or the other.

Please then send a copy of the General Council's resolution—which can be as simple as a statement that the settlement offer in Docket No. 74 is either accepted or rejected—to me so that I may file a copy with the Court by November 1, 1984, the deadline imposed by the Court. This procedure comes into play only if there is rejection of the settlement offer. In that event, *it is important that this procedure be followed* because Judge Yock has stated that "sanctions will be imposed in the event this second order of the Court, regarding the pending settlement offer, is not complied with", including the sanction of dismissal of the case as to your Tribe. (Order, p. 3.) Other sanctions could include a daily monetary charge against the Tribe.

Best personal regards,

 Sincerely,

 Marvin J. Sonosky

MJS/jbc

Enclosure

cc: Mr. Norman Hollow, Chairman
 Mr. Dennis Whiteman, Superintendent

CERTIFIED MAIL NO. 0818784
RETURN RECEIPT REQUESTED

## EXHIBIT A–7

LAW OFFICES

SONOSKY, CHAMBERS, SACHSE & GUIDO

1050 31ST STREET, N.W.

WASHINGTON, D.C. 20007

September 14, 1984

Mr. Charles W. Murphy

Chairman

Standing Rock Sioux Tribal Council

Fort Yates, North Dakota 58538

Re: *Docket No. 74 (1868 Treaty case)*

Dear Mr. Murphy:

For your information and appropriate action I am enclosing an order entered by the United States Claims Court on August 29, 1984 with respect to the Government's outstanding offer of settlement in the 1868 Treaty case (Docket No. 74).

As you will note, the Court is aware that the Standing Rock Tribe has rejected the proposed settlement, as evidenced by letter dated May 11, 1984, and enclosed Resolution No. 89–94, adopted April 24, 1984, filed with the Clerk of the Court. Judge Yock, however, has granted those four tribes that already have complied with his prior order, including the Standing Rock Sioux Tribe, until November 1, 1984, "to reconsider or to otherwise communicate their intentions regarding this lawsuit." (Order, p. 3.)

In short, the Court has provided that the Standing Rock Sioux Tribe *may* wish to reconsider its prior action and that its decision on whether to do so and, if so, the result should be communicated in writing to counsel before November 1, 1984. Accordingly, I look forward to hearing from you before that date. In the interim, if you have any questions, please feel free to call upon me.

Best personal regards,

Sincerely,

/s/ Marvin J. Sonosky

Marvin J. Sonosky

MJS/jbc
Enclosure
CERTIFIED MAIL NO. 0818785

EXHIBIT A–8

LAW OFFICES

SONOSKY, CHAMBERS, SACHSE & GUIDO

1050 31ST STREET, N.W.

WASHINGTON, D.C. 20007

(202) 342–9131

November 6, 1984

Mr. Wallace Wells, Jr.
Chairman
Crow Creek Sioux Tribal Council
Fort Thompson, South Dakota 57339

Re: *Sioux—Docket No. 74 (1868 Treaty case)*

Dear Mr. Wells:

As you know the Crow Creek Sioux Tribe accepted the offer in settlement of the offset claim in No. 74, the 1868 Treaty case.

Through inadvertence, because the Crow Creek Tribe had accepted the offer, I failed to transmit to you a copy of the order of the court entered August 29, 1984. I did not read that order to have specific application to the Crow Creek Tribe because the Crow Creek Tribe had accepted the offer in settlement. However, by supplemental order the court directed that each tribe be furnished with a copy of the order.

Best personal regards,

Sincerely,

/s/ Marvin J. Sonosky

Marvin J. Sonosky

MJS/jbc
Enclosure
cc: Ms. Sharlene Rojas, Secretary
Arthur Lazarus, Jr., Esquire
CERTIFIED MAIL NO. 0818689
RETURN RECEIPT REQUESTED

## EXHIBIT B-1
### CHEYENNE RIVER SIOUX TRIBE

**● SENDER:** Complete items 1, 2, 3, and 4.
Add your address in the "RETURN TO" space on reverse.

**(CONSULT POSTMASTER FOR FEES)**

1. The following service is requested (check one).
 - ☑ Show to whom and date delivered ................ ___₵
 - ☐ Show to whom, date, and address of delivery.. ___₵
2. ☐ RESTRICTED DELIVERY ___₵
 *(The restricted delivery fee is charged in addition to the return receipt fee.)*

TOTAL ₴____

3. ARTICLE ADDRESSED TO:
 Mr Morgan Garreau
 P.O. Box 590
 Eagle Butte S.D. 57625

4. TYPE OF SERVICE:
 - ☐ REGISTERED ☐ INSURED
 - ☑ CERTIFIED ☐ COD
 - ☐ EXPRESS MAIL

 ARTICLE NUMBER: P-741-399-137

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐ Addressee ☑ Authorized agent

5. *Dell Cork-Swen*

DATE OF DELIVERY: 9-17-84 POSTMARK

6. ADDRESSEE'S ADDRESS (Only if requested)

7. UNABLE TO DELIVER BECAUSE: 7a. EMPLOYEE'S INITIALS: *Lmm*

---

**● SENDER:** Complete items 1, 2, 3, and 4.
Add your address in the "RETURN TO" space on reverse.

**(CONSULT POSTMASTER FOR FEES)**

1. The following service is requested (check one).
 - ☑ Show to whom and date delivered ................ ___₵
 - ☐ Show to whom, date, and address of delivery.. ___₵
2. ☐ RESTRICTED DELIVERY ___₵
 *(The restricted delivery fee is charged in addition to the return receipt fee.)*

TOTAL ₴____

3. ARTICLE ADDRESSED TO:
 Ms. Arlene Thompson
 P.O. Box 590
 Eagle Butte S.D. 57625

4. TYPE OF SERVICE:
 - ☐ REGISTERED ☐ INSURED
 - ☑ CERTIFIED ☐ COD
 - ☐ EXPRESS MAIL

 ARTICLE NUMBER: P-741-399-138

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐ Addressee ☑ Authorized agent

5. *Billy Cork-Swen*

DATE OF DELIVERY: 9-17-84 POSTMARK EAGLE 1984

6. ADDRESSEE'S ADDRESS (Only if requested)

7. UNABLE TO DELIVER BECAUSE: 7a. EMPLOYEE'S INITIALS: *Lmm*

EXHIBIT B-2

## CROW CREEK SIOUX TRIBE

**SENDER:** Complete items 1, 2, and 3.
Add your address in the "RETURN TO" space on reverse.

1. The following service is requested (check one.)
 ☒ Show to whom and date delivered............ ____ ¢
 ☐ Show to whom, date and address of delivery... ____ ¢
 ☐ RESTRICTED DELIVERY
 Show to whom and date delivered...........____ ¢
 ☐ RESTRICTED DELIVERY.
 Show to whom, date, and address of delivery.$____

 (CONSULT POSTMASTER FOR FEES)

2. **ARTICLE ADDRESSED TO:**
 Wallace Wells, Jr., Chairman
 Crow Creek Sioux Tribal Council
 Fort Thompson, S.D. 57339

3. **ARTICLE DESCRIPTION:**

| REGISTERED NO. | CERTIFIED NO. | INSURED NO. |
|---|---|---|
| | 0818689 | |

(Always obtain signature of addressee or agent)

I have received the article described above.
**SIGNATURE** ☐ Addressee ☐ Authorized agent.

4. **DATE OF DELIVERY** | **POSTMARK**

5. **ADDRESS (Complete only if requested)**

6. **UNABLE TO DELIVER BECAUSE:** | **CLERK'S INITIALS**

PS Form 3811, Jan. 1979

RETURN RECEIPT, REGISTERED, INSURED AND CERTIFIED MAIL

GPO : 1979-288-848

## EXHIBIT B–3

### LOWER BRULE SIOUX TRIBE

**Left card:**

PS Form 3811, Jan. 1976

**SENDER:** Complete items 1, 2, and 3.
Add your address in the "RETURN TO" space on reverse.

1. The following service is requested (check one.)
 - ☒ Show to whom and date delivered........... ¢
 - ☐ Show to whom, date and address of delivery... ¢
 - ☐ RESTRICTED DELIVERY
 Show to whom and date delivered........... ¢
 - ☐ RESTRICTED DELIVERY.
 Show to whom, date, and address of delivery.$____

 (CONSULT POSTMASTER FOR FEES)

2. ARTICLE ADDRESSED TO:
 Mr. Patrick Spears, Chairman
 Lower Brule Sioux Tribal Council
 Lower Brule, South Dakota 57548

3. ARTICLE DESCRIPTION:

| REGISTERED NO. | CERTIFIED NO. | INSURED NO. |
|---|---|---|
| | 0818783 | |

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐Addressee ☒Authorized agent
*Wayne M Estes*

DATE OF DELIVERY: 9. 17-84 POSTMARK

5. ADDRESS (Complete only if requested)

6. UNABLE TO DELIVER BECAUSE: CLERK'S INITIALS

PS Form 3811, Jan. 1976

**SENDER:** Complete items 1, 2, and 3.
Add your address in the "RETURN TO" space on reverse.

1. The following service is requested (check one.)
 - ☒ Show to whom and date delivered........... ¢
 - ☐ Show to whom, date and address of delivery... ¢
 - ☐ RESTRICTED DELIVERY
 Show to whom and date delivered........... ¢
 - ☐ RESTRICTED DELIVERY.
 Show to whom, date, and address of delivery.$____

 (CONSULT POSTMASTER FOR FEES)

2. ARTICLE ADDRESSED TO:
 Patrick Spears, Chairman
 Lower Brule Tribal Council
 Lower Brule, S D. 57548

3. ARTICLE DESCRIPTION:

| REGISTERED NO. | CERTIFIED NO. | INSURED NO. |
|---|---|---|
| | 0818791 | |

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐Addressee ☐Authorized agent
*Wayne M Estes*

DATE OF DELIVERY: 10-22-84 POSTMARK

5. ADDRESS (Complete only if requested)

6. UNABLE TO DELIVER BECAUSE: CLERK'S INITIALS

## EXHIBIT B–4
### OGLALA SIOUX TRIBE

**Form 1 (left):**

● SENDER: Complete items 1, 2, 3, and 4.
Add your address in the "RETURN TO" space on reverse.

(CONSULT POSTMASTER FOR FEES)

1. The following service is requested (check one).
☑ Show to whom and date delivered .................... ¢
☐ Show to whom, date, and address of delivery.. ¢
2. ☐ RESTRICTED DELIVERY ¢
 *(The restricted delivery fee is charged in addition to the return receipt fee.)*

TOTAL $

3. ARTICLE ADDRESSED TO:
Mr. Kester Cummings
Box 468
Pine Ridge, S.D. 57770

4. TYPE OF SERVICE:
☐ REGISTERED ☐ INSURED
☑ CERTIFIED ☐ COD
☐ EXPRESS MAIL

ARTICLE NUMBER
P.741-399-136

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐ Addressee ☐ Authorized agent
Karen Roy

DATE OF DELIVERY
POSTMARKED
SEP 17 1984
PINE RIDGE SD

6. ADDRESSEE'S ADDRESS (Only if requested)

7. UNABLE TO DELIVER BECAUSE:

7a. EMPLOYEE'S INITIALS
WTR

**Form 2 (right):**

● SENDER: Complete items 1, 2, 3, and 4.
Add your address in the "RETURN TO" space on reverse.

(CONSULT POSTMASTER FOR FEES)

1. The following service is requested (check one).
☑ Show to whom and date delivered .................... ¢
☐ Show to whom, date, and address of delivery.. ¢
2. ☐ RESTRICTED DELIVERY ¢
 *(The restricted delivery fee is charged in addition to the return receipt fee.)*

TOTAL $

3. ARTICLE ADDRESSED TO:
Mr. John Steele
Box 468
Pine Ridge, S.D. 57770

4. TYPE OF SERVICE:
☐ REGISTERED ☐ INSURED
☑ CERTIFIED ☐ COD
☐ EXPRESS MAIL

ARTICLE NUMBER
P.741-399-135

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐ Addressee ☑ Authorized agent
Ted Guin

DATE OF DELIVERY
SEP 18 1984
POSTMARKED
PINE RIDGE, SD
SEP 18 1984

6. ADDRESSEE'S ADDRESS (Only if requested)

7. UNABLE TO DELIVER BECAUSE:

7a. EMPLOYEE'S INITIALS
/SPO

**Form 3 (bottom):**

● SENDER: Complete items 1, 2, 3, and 4.
Add your address in the "RETURN TO" space on reverse.

(CONSULT POSTMASTER FOR FEES)

1. The following service is requested (check one).
☐ Show to whom and date delivered .................... ¢
☐ Show to whom, date, and address of delivery.. ¢
2. ☐ RESTRICTED DELIVERY
 *(The restricted delivery fee is charged in addition to the return receipt fee.)*

TOTAL $

3. ARTICLE ADDRESSED TO:
Mr. Eileen Ann Cloud
Box 468
Pine Ridge, SD 57770

4. TYPE OF SERVICE:
☐ REGISTERED ☐ INSURED
☑ CERTIFIED ☐ COD
☐ EXPRESS MAIL

ARTICLE NUMBER
P.741-399-134

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐ Addressee ☑ Authorized agent
Ted Guin

DATE OF DELIVERY
SEP 18 1984
POSTMARKED
PINE RIDGE, SD
SEP 18 1984

6. ADDRESSEE'S ADDRESS (Only if requested)

7. UNABLE TO DELIVER BECAUSE:

7a. EMPLOYEE'S INITIALS

PS Form 3811, Dec. 1980

RETURN RECEIPT, REGISTERED, INSURED AND CERTIFIED MAIL

EXHIBIT B–5

## ROSEBUD SIOUX TRIBE

**SENDER:** Complete items 1, 2, and 3.
Add your address in the "RETURN TO" space on reverse.

1. The following service is requested (check one.)
 ☒ Show to whom and date delivered. . . . . . . . . . . . . ___ ¢
 ☐ Show to whom, date and address of delivery. . . ___ ¢
 ☐ RESTRICTED DELIVERY
 Show to whom and date delivered. . . . . . . . . . . . ___ ¢
 ☐ RESTRICTED DELIVERY.
 Show to whom, date, and address of delivery.$___

(CONSULT POSTMASTER FOR FEES)

2. ARTICLE ADDRESSED TO:
 Mr. Webster Two Hawk, Pres.
 Rosebud Sioux Tribal Council
 White River, S.D. 57579

3. ARTICLE DESCRIPTION:

| REGISTERED NO. | CERTIFIED NO. | INSURED NO. |
|---|---|---|
| | 0818782 | |

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐ Addressee ☒ Authorized agent

4. [signature]

DATE OF DELIVERY 9-17-84

POSTMARK WHITE RIVER SD SEP 17 1984 USPO

5. ADDRESS (Complete only if requested)

6. UNABLE TO DELIVER BECAUSE:

CLERK'S INITIALS

☆GPO : 1978-285-848

EXHIBIT B–6

SANTEE SIOUX TRIBE

| SENDER: | Complete items 1, 2, and 3. Add your address in the "RETURN TO" space on reverse. |
|---|---|

1. The following service is requested (check one.)
- ☒ Show to whom and date delivered........... ¢
- ☐ Show to whom, date and address of delivery... ¢
- ☐ RESTRICTED DELIVERY
 Show to whom and date delivered............ ¢
- ☐ RESTRICTED DELIVERY.
 Show to whom, date, and address of delivery.$___

(CONSULT POSTMASTER FOR FEES)

2. ARTICLE ADDRESSED TO:

Richard L. Kitto, Chairman
Santee Sioux Tribal Council
Niobrara, Nebraska 68760

3. ARTICLE DESCRIPTION:

| REGISTERED NO. | CERTIFIED NO. | INSURED NO. |
|---|---|---|
| | 0818699 | |

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐Addressee ☐Authorized agent

4. DATE OF DELIVERY | POSTMARK

5. ADDRESS (Complete only if requested)

6. UNABLE TO DELIVER BECAUSE: | CLERK'S INITIALS

☆GPO : 1979 208-842

---

| SENDER: | Complete items 1, 2, and 3. Add your address in the "RETURN TO" space on reverse. |
|---|---|

1. The following service is requested (check one.)
- ☐ Show to whom and date delivered........... ¢
- ☐ Show to whom, date and address of delivery... ¢
- ☐ RESTRICTED DELIVERY
 Show to whom and date delivered............ ¢
- ☐ RESTRICTED DELIVERY.
 Show to whom, date, and address of delivery.$___

(CONSULT POSTMASTER FOR FEES)

2. ARTICLE ADDRESSED TO:

Richard Kitto, Chairman
Santee Sioux Tribal Council
Niobrara, Nebraska 68760

3. ARTICLE DESCRIPTION:

| REGISTERED NO. | CERTIFIED NO. | INSURED NO. |
|---|---|---|
| | 0818792 | |

(Always obtain signature of addressee or agent)

I have received the article described above.

SIGNATURE ☐Addressee ☐Authorized agent

4. DATE OF DELIVERY | POSTMARK
10-22-84

5. ADDRESS (Complete only if requested)

6. UNABLE TO DELIVER BECAUSE: | CLERK'S INITIALS

☆GPO : 1979-208-842

EXHIBIT B–7

## STANDING ROCK SIOUX TRIBE

EXHIBIT C

## CHEYENNE RIVER SIOUX TRIBAL COUNCIL

## Tribal Memorandum:

TO : SUPERINTENDENT, Cheyenne River Agency DATE 10/17/84

FROM : Arlene Thompson, Tribal Secretary

SUBJECT: RESOLUTION NO. 224–84–CR: Resolution declaring the rejection of the award of $44 million ($44,000,000.00) dollars for Docket 74, in order for the Tribe to accept a settlement on this claim, the award must include the return of the lands in addition to monetary compensation, and reaffirming the claim for the lands that are specified in Docket 74 and that this rejection of the monetary award shall not constitute abandonment of the claim.

Transmitted herewith is an original and five (5) copies of Resolution No. 224–84–CR, which was adopted by the Cheyenne River Sioux Tribal Council, during its Special Session held on October 15, 1984.

cc: Chairman
Treasurer
Administrative Officer
Liaison Officer
Central Records
Councilmembers
William Howard Payne, Claims Attorney
Fried, Frank, Harris, Shriver & Kampelman
File/2

## RESOLUTION NO. 224–84–CR

WHEREAS, the Cheyenne River Sioux Tribe of South Dakota is an unincorporated Tribe of Indians, having accepted the provisions of the Act of June 18, 1934 (48 Stat. 984), and

WHEREAS, the Tribe, in order to establish its tribal organization; to conserve its tribal property; to develop its common resources; and to promote the general welfare of its people, has ordained and established a Constitution and By-Laws, and

WHEREAS, the Cheyenne River Sioux Tribe has a vested interest in Docket 74, involving tribal lands in the States of North Dakota, Montana, Wyoming, Nebraska, Northern Kansas and Northeastern Colorado, plus 14 million acres of aboriginal title east of the Missouri River in North and South Dakota, and

WHEREAS, the Cheyenne River Sioux Tribal Council did deliberate the issue of Docket 74 during their October 15, 1984 Special Session, and

WHEREAS, Docket 74 has been of great concern to the Cheyenne River Sioux Tribe for many generations and the award of the $44 million by the Court of Claims is not acceptable to the members of the Cheyenne River Sioux Tribe, and

WHEREAS, the Cheyenne River Sioux Tribal Council is of the opinion that the Court of Claims award does not fully and justifiably compensate the Sioux Indians for the illegal taking of their lands, and

WHEREAS, the Cheyenne River Sioux Tribal Council is also of the opinion that in order for the Tribe to accept a settlement on this claim, the award must include the return of the lands in addition to monetary compensation, now

THEREFORE BE IT RESOLVED, that we, the duly elected members of the governing body of the Cheyenne River Sioux Tribe hereby declare that we reject the award of $44 million dollars for Docket 74, and

BE IT FURTHER RESOLVED, that we, the duly elected members of the governing body of the Cheyenne River Sioux Tribe hereby reaffirm our claim for the lands that are specified in Docket 74 and that this rejection of the monetary award shall not constitute abandonment of our claim.

## CERTIFICATION

I, the undersigned, as Secretary of the Cheyenne River Sioux Tribal Council, certify that the Tribal Council is composed of fifteen (15) members, of whom 14, constituting a quorum, were present at a meeting, duly and specially called, noticed, convened and held this 15th day of October, 1984, Special Session; and that the foregoing resolution was duly adopted at such meeting by an affirmative vote of 14 for, 0 against, 0 not voting and 1 absent.

/s/ Arlene Thompson
Arlene Thompson, Secretary
Cheyenne River Sioux Tribe

## EXHIBIT D

.TRIBAL RESOLUTION

NUMBER CC-84-04-10-02

SUBJECT Approval of Case No. 74 - $39,749.700

WHEREAS: the United States has offered to settle the claim of the Sioux Nation arising under the Treaty of April 29, 1868, in the case idenfified as No. 74 before the United States Claims Courts; and

WHEREAS: the Terms of the offer of settlement are expressed in a letter dated July 27, 1982, and isgned by Assistance Attorney General Carol E. Dinkins; and

WHEREAS: the claims attorneys have submitted to the Tribal Council their written report dated January 25, 1984, recommending that the tribe accept the offer in settlement;

NOW THEREFORE BE IT RESOLVED, That the offer made by the United States to settle for the entry of final judgment in the sum of $39,749,700.00 in Case No. 74 be and the same is hereby accepted and approved.

BE IT FURTHER RESOLVED, That the Tribe's claims attorney or the attorney of record is hereby authorized to sign and execute any writing or document that may be appropriate, or necessary, to carry out the settlement of this case.

## CERTIFICATION

THE FOREGOING RESOLUTION was duly adopted by the Crow Creek Sioux Tribal Council on the ____10th____ day of ____April____, 19__84__ in a ____Special____ Session by a vote of ____9____ for, ____0____ against, ____2____ absent, ____0____ not voting for The Crow Creek Sioux Tribe, pursuant to authority vested in it by Article VI, Section 1 of the Constitution of the Tribe, ratified by the Tribe on March 11, 1949 and approved by the Secretary of the Interior on April 26, 1949 and with amendments approved by the Commissioner of Indian Affairs on June 22, 1961, February 25, 1963 and by the Area Director on June 23, 1980.

RECEIVED APR 27 1984

_Secretary_

ATTEST:

_Chairman_

## EXHIBIT E-1

Patrick Spears
Chairman

605-473-5561
Lower Brule, SD 57548

October 15, 1984

Marvin J. Sonosky
1050 31st Street, N.W.
Washington, D.C. 20007

Dear Mr. Sonosky:

As indicated in my April 25, 1984 letter, the Lower Brule Sioux Tribe has rejected the offer of U.S. Government of the monetary settlement of Dockets 74 and 74-B. The Tribe is in favor or restoration of land and demands trespass damages for the unlawful taking of the Black Hills, theft of mineral wealth and removal of other renewable and non-renewable resources.

As you will note in the attached resolutions, the Tribe, in addition to rejection of the monetary settlement, has joined the Black Hills Steering Committee and supports the efforts for land return.

The Tribal Council also directs you to withdraw Docket 74 without prejudice to the Tribe and to assist the Tribe in the return of Federal lands in the Black Hills and in western South Dakota through the legislative process. We further request that Dockets 74 and 74-B be viewed as one claim in an honorable settlement between the Sioux Nation and the U.S. Government.

On your submission of these documents to the U.S. Claims Court, please provide us with any response and your opinions or strategies for trespass damage compensation.

In your earlier communication, you indicated that land restoration is possible. Please provide us with your recommendations and plan of action for assisting the Tribe in our efforts to seek a legislative settlement for both Docket 74 and 74-B.

Sincerely,

*Patrick Spears*

Patrick Spears, Chairman
Lower Brule Sioux Tribe

## EXHIBIT E-2

RESOLUTION NO. 84-44
LOWER BRULE SIOUX TRIBE

### RESOLUTION STATING OFFICIAL POSITION OF LOWER BRULE SIOUX TRIBE ON THE BLACK HILLS CLAIM

WHEREAS, the Indian Claims Commission has awarded $17.1 million for the Black Hills to the Sioux Nation; and

WHEREAS, the Lower Brule Sioux Tribe is one of the separate and distinct sovereign nations who are entitled to compensation for the unconstitutional confiscation of the Black Hills in 1877; and

WHEREAS, the Lower Brule Sioux Tribe does not believe that the $17.1 million plus simple interest awarded for the Black Hills is adequate compensation for the Hills since there is no adjustment for inflation, the award is ridiculously low, and makes no provision for land restoration since the Indian Claims Commission's jurisdiction was limited to monetary compensation only; and

WHEREAS, the Black Hills are sacred to Indian people who still practice traditional Indian religion and the Lower Brule Sioux Tribe believes that any final settlement of the Black Hills claim must include land restoration before the claim can be settled honorably; and

WHEREAS, Marvin J. Sonosky, Claims Attorney for the Lower Brule Sioux Tribe, has advised the Lower Brule Sioux Tribal Council that it is possible to get federal lands in the Black Hills returned to the Sioux Nation and that land restoration is a worthy goal for the Tribe to pursue.

NOW THEREFORE BE IT RESOLVED that it is the official position of the Lower Brule Sioux Tribe that the Tribe hereby rejects the $17.1 million plus interest award for the Black Hills and demands land restoration plus trespass damages of not less than $1 billion as a final settlement for the Black Hills confiscation.

### CERTIFICATION

The foregoing resolution was duly adopted by the Lower Brule Sioux Tribal Council assembled in Regular Session, with quorum present, on the 20th day of April 1984, by Roll Call vote; DeWayne Goodface-aye, Charles Langdeau-aye, William Ziegler-aye, Winona Long-aye, Michael Jandreau-aye, and Kay Gourneau-absent.

*Patrick Spears*

Patrick Spears, Chairman
Lower Brule Sioux Tribe

ATTEST:

*Winona Long*

William Ziegler, Secretary/Treasurer
Lower Brule Sioux Tribe

EXHIBIT E-3

RESOLUTION NO. 84-45
LOWER BRULE SIOUX TRIBE

## RESOLUTION DIRECTING MARVIN J. SONOSKY TO ASSIST THE LOWER BRULE SIOUX TRIBE IN DRAFTING, SUPPORTING AND LOBBYING LEGISLATION FOR LAND RESTORATION IN THE BLACK HILLS FOR THE SIOUX NATION

WHEREAS, the Lower Brule Sioux Tribe has passed a resolution (no. 84-46) stating it's official position on the Black Hills claim; and

WHEREAS, the official position taken by the tribe is "that the tribe hereby rejects the $17.1 million plus interest award for the Black Hills and demands land restoration plus trespass damages of not less than $1 billion as a final settlement for the Black Hills confiscation"; and

WHEREAS, to implement and make the tribal position meaningful, the tribe believes that it must actively participate in the drafting and lobbying of a bill through the United States Congress to return federal lands in the Black Hills to the Sioux Nation, i.e., separate and distinct sovereign bands of Sioux Indians who are entitled to the Black Hills; and

WHEREAS, Marvin J. Sonosky, tribal claims attorney, has indicated that land restoration is possible in the Black Hills; and

WHEREAS, the tribe believes that Mr. Sonosky should be directed to assist the tribe in drafting, supporting and lobbying legislation through the United States Congress for land restoration plus trespass damages for the unlawful taking of the Black Hills and subsequent theft of mineral wealth and removal of other renewable and non-renewable resources.

NOW THEREFORE BE IT RESOLVED that Marvin J. Sonosky is hereby ordered and directed to assist the Lower Brule Sioux Tribe in drafting, supporting and lobbying legislation through the United States Congress for the restoration of federal lands in the Black Hills to the Sioux Nation.

### CERTIFICATION

The foregoing resolution was duly adopted by the Lower Brule Sioux Tribal Council assembled in Regular Session, with quorum present, on the 20th day of April 1984, by Roll Call Vote; Charles Langdeau-aye, Michael Jandreau-aye, Winona Long-aye, DeWayne Goodface-aye, William Ziegler-absent, and Kay Gourneau-absent.

Patrick Spears, Chairman
Lower Brule Sioux Tribe

ATTEST:

William Ziegler, Secretary/Treasurer
Lower Brule Sioux Tribe

112

EXHIBIT E-4

RESOLUTION NO. 84-46
LOWER BRULE SIOUX TRIBE

RESOLUTION OF THE LOWER BRULE SIOUX TRIBE TO JOIN THE BLACK HILLS STEERING
COMMITTEE

WHEREAS, the Ft. Peck, Standing Rock, Cheyenne River, Crow Creek, Rose-
bud, and Pine Ridge Sioux Tribes have officially formed a steering committee
to draft and lobby legislation through the United States Congress to seek
land restoration on the Black Hills for the Sioux Nation; and

WHEREAS, the Lower Brule Sioux Tribe is the only Lakota Tribe that has
not joined the Steering Committee; and

WHEREAS, the Lower Brule Sioux Tribe has taken an official position that
federal lands must be restored to the Sioux Nation as part of a final settle-
ment for the Black Hills; and

WHEREAS, the Tribal Council believes that it would be in the best inte-
rests of the tribe to join the Black Hills Steering Committee so that a united
effort can be made by the Sioux Nation to obtain such land restoration.

NOW THEREFORE BE IT RESOLVED that the Lower Brule Sioux Tribe hereby joins
the Black Hills Steering Committee and agrees to work with all other Sioux
Tribes that have joined the Steering Committee in seeking the restoration of
federal lands in the Black Hills to the Sioux Nation.

BE IT FURTHER RESOLVED that any action of the Steering Committee shall
not be binding on the Tribal Council without its prior approval.

AND BE IT FURTHER RESOLVED that the Black Hills Sioux Nation Council re-
presentative for Lower Brule shall represent the Tribe on the Steering Commi-
ttee.

CERTIFICATION

The foregoing resolution was duly adopted by the Lower Brule Sioux Tribal Coun-
cil assembled in Regular Session, with quorum present, on the 20th day of April
1984, by Roll Call Vote; Charles Langdeau-aye, DeWayne Goodface-aye, Winona Long-
aye, Michael Jandreau-absent, Kay Gourneau-absent, and William Ziegler-absent.

_Patrick Spears_
Patrick Spears, Chairman
Lower Brule Sioux Tribe

ATTEST:

_William Ziegler_
William Ziegler, Secretary/Treasurer
Lower Brule Sioux Tribe

EXHIBIT E-5

RESOLUTION NO 84-47
LOWER BRULE SIOUX TRIBE

RESOLUTION RESPONDING TO THE UNITED STATES GOVERNMENT'S OFFER
TO SETTLE DOCKET 74

WHEREAS, Docket 74 involves 48,142,000 acres of Sioux lands unlawfully confiscat-
ed by the United States Government; and

WHEREAS, 33,869,000 acres lies west of the Missouri River in the States of North Dakota, Montana, Wyoming and Nebraska and also includes hunting rights (but not the extinguishment of aboriginal title) to lands in northern Kansas and northeastern Colorado; and

WHEREAS, 14,273,000 acres lies east of the Missouri River in the States of North Dakota and South Dakota; and

WHEREAS, Docket 74 does not include any lands lying west of the Missouri River in the State of South Dakota; and

WHEREAS, the 1877 Act which unconstitutionally confiscated the Black Hills also confiscated the 33,869,000 acres and hunting rights in Docket 74 west of the Missouri River in the States above-mentioned; and

WHEREAS, the 1877 Act did not mention and did not confiscate the 14,273,000 acres of land lying east of the Missouri River in the States above-mentioned; and

WHEREAS, the 14,273,000 acres is held by the Sioux Nation by aboriginal title (i.e., not recognized by any treaty) and such title will be extinguished only when the tribes allow the title to be extinguished through the Indian Claims Commission process by the payment and acceptance of a monetary award; and

WHEREAS, the Indian Claims Commission awarded $43,949,000 for the Docket 74 lands and the Government now seeks to offset the award by $60 million; and

WHEREAS, the Indian Claims Commission process appears to be a complete sham awarding $43,949,000 for 48,142,000 acres of land and allowing the United States Government to make offsets which could amount up to $60 million which could result in the Sioux Nation owing the United States $17 million for the theft of its lands; and

WHEREAS, the Lower Brule Sioux Tribe believes that Docket 74 and Docket 74B (Black Hills Claim) should be treated as one claim and settled as one claim in a manner that is just and honorable to both the Sioux Nation and United States.

NOW THEREFORE BE IT RESOLVED that the Lower Brule Sioux Tribe hereby rejects the Government's offer in Docket 74.

AND BE IT FURTHER RESOLVED that Marvin J. Sonosky, claims attorney, is hereby directed to withdraw Docket 74 without prejudice to the Tribe and assist the Tribe in seeking the restoration of federal lands in the Black Hills and western South Dakota by legislation as a complete settlement for both Dockets 74 and 74B.

## CERTIFICATION

The foregoing resolution was duly adopted by the Lower Brule Sioux Tribal Council assembled in Regular Session, with quorum present, on the 20th day of April 1984, by Roll Call vote; Charles Langdeau—aye, DeWayne Goodface—aye, Winona Long—aye, Michael Jandreau—absent, Kay Gourneau—absent, William Ziegler—absent.

Patrick Spears
_____
Patrick Spears, Chairman
Lower Brule Sioux Tribe

ATTEST:

Winona Long
_____
William Ziegler, Secretary/Treasurer
Lower Brule Sioux Tribe

EXHIBIT E–6

**Patrick Spears**
**Chairman**

605-473-5561
Lower Brule, SD 57548

April 25, 1984

Marvin J. Sonosky
1050 31st Street, N.W.
Washington, D.C. 20007

Dear Mr. Sonosky:

On April 20, 1984 the Lower Brule Tribal Council passed legislation stating the position of the Lower Brule Sioux Tribe on Dockets 74 and 74-B. The Tribe unanimously rejected the monetary claims being offered in the amounts of $44 million and $17.1 million respectively.

The Tribe also demands land restoration and trespass damages of not less than $1 billion dollars for the illegal Black Hills confiscation. The acceptance of the $44 million dollars for the Docket 74 lands and the allowance of the U.S. Government to make offsets up to $60 million is complete foolishness; therefore, the Lower Brule Sioux Tribe rejects the offer.

The Tribe has also expressed it's support for land restoration and joined the Black Hills Steering Committee. The Tribal Council has further directed you to assist the Tribe in drafting, supporting and lobbying legislation through Congress for land restoration and trespass damages for the Black Hills taking and removal of mineral and other renewable and non-renewable resources.

We request that you communicate our position to the U.S. Claims Court and inform the Tribe of any subsequest actions.

Sincerely,

Patrick Spears, Chairman
Lower Brule Sioux Tribe

EXHIBIT E–7

LAW OFFICES

SONOSKY, CHAMBERS, SACHSE & GUIDO

1050 31ST STREET, N.W.

MARVIN J. SONOSKY
HARRY R. SACHSE
REID PEYTON CHAMBERS
KENNETH J. GUIDO, JR.
WILLIAM R. PERRY
LLOYD BENTON MILLER
DONALD J. SIMON

KEVIN A. GRIFFIN
MARY V. BARNEY
DOUGLAS B. L. ENDRESON*
LOUISE LYNCH

*ADMITTED IN WISCONSIN

WASHINGTON, D.C. 20007
(202) 342-9131

OF COUNSEL
LOFTUS E. BECKER, JR.

October 24, 1984

Mr. Patrick Spears
Chairman
Lower Brule Sioux Tribal Council
Lower Brule, South Dakota 57548

Re: <u>Sioux No. 74 (1868 Treaty)</u>

Dear Mr. Spears:

I have your letter of October 15, 1984 and its enclosures, including one copy each of your letter of April 25, 1984 to me, Resolution No. 84-47 rejecting the Government's offer to settle Docket No. 74, and Resolutions Nos. 84-44, -45 and -46.

The Court will be furnished with a copy of each resolution you sent to me, together with your letter under acknowledgment advising that the Tribal Council, by Resolution No. 84-47, wishes to "withdraw Docket 74 without prejudice to the Tribe ***." The Court will also be furnished with a copy of your letter of April 25, 1984.

I shall furnish you with a copy of any transmittal to the Court.

There are several items in your letter and resolutions that should be cleared up. First, we are here dealing with the 1868 Treaty claim -- Docket No. 74, not the Black Hills claim -- Docket No. 74B. No. 74B has been adjudicated and the money has been deposited in the Treasury. The Black Hills claim no longer is before the Court. While I understand your wish that Docket No. 74 and No. 74B be viewed as one claim, in my view this is not possible so far as the court proceedings are concerned.

Second, your letter of October 15, 1984 asks for my "recommendations and plan of action for assisting the Tribe in our efforts to seek a legislative settlement for both Docket 74 and 74B." Resolution No. 84-45 orders and directs me to assist the Tribe "in drafting, supporting and lobbying legislation through *** Congress for the restoration of federal lands in the Black Hills to the Sioux Nation."

Paragraph 2 of my contract with the Lower Brule Tribe reads as follows:

2. It shall be the duty of the ATTORNEYS to advise and represent the TRIBE in connection with the investigation, preparation, and prosecution of the three Black Hills claims, known as. Docket No. 74 before the Indian Claims Commission and as Appeals No. 4-55 in the Court of Claims, plus Docket No. 116 before the Indian Claims Commission.

You can see that my contract does not extend to the services demanded by the "Resolve" clause of Resolution No. 84-45, or by the request in the last paragraph of your letter of October 15, 1984.

Third, I have from time to time in years past advised tribal delegates that in my opinion there was a possibility of obtaining legislation restoring some federal land to the Sioux Nation. I also advised that this possibility was present whether the tribes accepted or rejected the offer. I further advised that to obtain such legislation might take a period of years over several Congresses. My suggestions were made well after the judgment was entered in the Black Hills claim, No. 74B.

The legislative opportunity still exists but of course I have no contract to cover the assignment you wish me to undertake. I might consider such a contract if the offer in settlement of No. 74 were accepted, and if all tribes agreed to join in one contract with me, or jointly with me and other attorneys that were satisfactory to me.

Fourth, finally the Seventh Whereas clause in Resolution No. 84-47 is incorrect. The 1868 Treaty included the cession of the 14,273,000 acres east of the Missouri River occupied by the Yanktonais and is covered by the award of $43,949,000. The Yanktonais signed the 1868 Treaty.

Best personal regards,

Sincerely,

/s/ Marvin J. Sonosky

Marvin J. Sonosky

MJS/jbc

cc: Each member of the Lower Brule Sioux Tribal Council
Superintendent
Area Director

EXHIBIT E–8

LAW OFFICES

SONOSKY, CHAMBERS, SACHSE & GUIDO

MARVIN J. SONOSKY
HARRY R. SACHSE
REID PEYTON CHAMBERS
KENNETH J. GUIDO, JR.
WILLIAM R. PERRY
LLOYD BENTON MILLER
DONALD J. SIMON

KEVIN A. GRIFFIN
MARY V. BARNEY
DOUGLAS B. L. ENDRESON*
LOUISE LYNCH

*ADMITTED IN WISCONSIN

1050 31ST STREET, N.W.
WASHINGTON, D.C. 20007
(202) 342-9131

OF COUNSEL
LOFTUS E. BECKER, JR.

October 19, 1984

Mr. Patrick Spears
Chairman
Lower Brule Sioux Tribal Council
Lower Brule, South Dakota 57548

Re: <u>Docket No. 74 (1868 Treaty case) – Second Notice</u>

Dear Mr. Spears:

I refer you to my letter of September 14, 1984, which you received on September 17, 1984, according to the returned certified mail receipt.

I remind you that November 1 is the deadline imposed by the Court in which to advise whether the Tribe will either accept or reject the offer in settlement. All tribes have responded now except Lower Brule and one other.

Best personal regards,

Sincerely,

/s/ Marvin J. Sonosky

Marvin J. Sonosky

MJS/jbc

cc: Mr. William Ziegler, Secretary-Treasurer
 Superintendent

CERTIFIED MAIL NO. 0818792
RETURN RECEIPT REQUESTED

---

EXHIBIT F

RESOLUTION NO. 84-47

RESOLUTION OF THE OGLALA SIOUX TRIBAL COUNCIL
OF THE OGLALA SIOUX TRIBE
(An Unincorporated Tribe)

RESOLUTION RESPONDING TO THE OCTOBER 21, 1983 ORDER OF THE COURT OF CLAIMS TO CONSIDER THE OFFER OF THE UNITED STATES GOVERNMENT TO SETTLE DOCKET 74 (FT. LARAMIE TREATY LAND CLAIMS).

WHEREAS, the United States of America has offered to settle the claim of the separate and distinct sovereign bands of Sioux Indians collectively referred to as the "Sioux Nation" in claims litigation, and

WHEREAS, the settlement offer involves the case identified as No. 74, originally filed in the Indian Claims Commission and now pending before the United States Court of Claims, and

WHEREAS, the terms of the United States' offer are set forth in a July 27, 1982 letter signed by Assistant Attorney General Carol E. Dinkins whereby the United States agrees to settle all

claims arising out of Docket 74 for $39,749,700.00 in favor of the Sioux bands which were parties to the 1868 Ft. Laramie Treaty (15 Stat. 635), and

WHEREAS, the Oglala Sioux Tribe has taken an official position in Docket 74 in Oglala Sioux Tribal Council Resolution No. 83–160.

NOW THEREFORE BE IT RESOLVED that the Oglala Sioux Tribe hereby affirms Resolution No. 83–160 stating the official tribal position in regards to Docket 74 in the United States Court of Claims.

C-E-R-T-I-F-I-C-A-T-I-O-N

I, as undersigned, Secretary of the Oglala Sioux Tribal Council, hereby certify that this resolution was adopted by the vote of: 10 for; 0 against; and 2 not voting, during a REGULAR Session held on the 17 day of APRIL, 1984.

/s/ Eileen H. Iron Cloud
EILEEN H. IRON CLOUD
Secretary
Oglala Sioux Tribe

A-T-T-E-S-T:
Sig. _____

Newton Cummings
President
Oglala Sioux Tribe

RECEIVED

APR 20 1984

Pine Ridge Agency

RESOLUTION OF THE OGLALA SIOUX TRIBAL COUNCIL
OF THE OGLALA SIOUX TRIBE
(An Unincorporated Tribe)

RESOLUTION STATING POSITION OF THE OGLALA SIOUX TRIBE ON DOCKET 74.

WHEREAS, the claims attorney contract between the Oglala Sioux Tribe and Arthur Lazarus, Jr. expired by its own terms in 1977 and has not been renewed, and

WHEREAS, in 1978, the Oglala Sioux Tribe elected not to refile the Black Hills claim under P.L. 95–254 (92 Stat. 153) and took an official position that it would seek a return of its sacred land instead, and

WHEREAS, it is still the Oglala Sioux Tribe's position that Arthur Lazarus, Jr. has no authority to represent the Oglala Sioux Tribe in any claims litigation and that the tribe intends to continue its efforts to seek land restoration in the Black Hills claim, and

WHEREAS, in a related claim, Docket 74, involving tribal lands in the States of North Dakota, Montana, Wyoming, Nebraska, Northern Kansas and Northeastern Colorado, plus 14 million acres of aboriginal title east of the Missouri River in North and South Dakota, Arthur Lazarus, Jr. has continued to represent the Oglala Sioux Tribe contrary to its actions that he not represent it, and

WHEREAS, the tribe has been informed that Mr. Lazarus has submitted a final brief in Docket 74 and that a final decision will be issued by the Court of Claims at any time, and

WHEREAS, upon a final decision and payment of the Docket 74 award, all tribal interests in Docket 74 will be extinguished, United States v. Dann, Slip Opinion Nos. 80–4298 & 80–4345 (9th Cir., May 19, 1983), and

WHEREAS, the Act of February 28, 1877 which confiscated the Black Hills also purported took the Docket 74 lands, and

WHEREAS, the Oglala Sioux Tribe has taken an official position that the 1877 Act is unconstitutional, and

WHEREAS, the Oglala Sioux Tribe desires to state its official position in regard to Docket 74.

NOW, THEREFORE, BE IT RESOLVED, that it is the official position of the Oglala Sioux Tribe that Arthur Lazarus, Jr. has no authority to represent the interests of the Oglala Sioux Tribe in Docket 74, and that it is the tribe's official position that Docket 74 be withdrawn from the Court of Claims and the tribe will seek a restoration of its 1868 Ft. Laramie lands either through court action or as a final legislative settlement for the Black Hills claims controversy.

C-E-R-T-I-F-I-C-A-T-I-O-N

I, as undersigned, Secretary of the Oglala Sioux Tribal Council, hereby certify that this resolution was adopted by the vote of: 19 for; 0 against and 0 not voting, during a REGULAR Session held on the 13th day of SEPTEMBER, 1983.

/s/ Eileen H. Iron Cloud
EILEEN H. IRON CLOUD
Secretary
Oglala Sioux Tribe

A-T-T-E-S-T:

/s/ J. American Horse
JOE AMERICAN HORSE
President
Oglala Sioux Tribe

RECEIVED

SEP 14 1983

Pine Ridge Agency

EXHIBIT G

RESOLUTION NO. 84-103

OF THE ROSEBUD SIOUX TRIBE

WHEREAS, The Rosebud Sioux Tribe is a federally recognized Indian Tribe organized pursuant to the Indian Reorganization Act of 1934 and all pertinent amendments thereof, and

WHEREAS, Having noted the injustice of U.S. government offsets and seeking a fairer judgement, the Rosebud Sioux Tribal Council must seek other options before a settlement is made on Docket 74, now

THEREFORE BE IT RESOLVED, That the Rosebud Sioux Tribal
Council hereby rejects the offer of the U.S.
Government to settle Docket 74 out of court for
$39,749,700.00

C E R T I F I C A T I O N

This is to certify that Resolution 84-103 was duly passed by
the Rosebud Sioux Tribal Council in session on April 30, 1984
by a vote of seventeen (17) in favor, six (6) opposed, one
(1) not voting. The said Resolution was adopted pursuant to
authority vested in the Council. A quorum was present.

Webster Two Hawk
President
Rosebud Sioux Tribe

ATTEST:

Lloyd B. One Star, Sr.
Secretary
Rosebud Sioux Tribe

DATE SUBMITTED 5·2-84
TO ROSEBUD AGENCY SUPT.

NOTED AND TRANSMITTED:

Superintendent

EXHIBIT H,

RES. 85-1

RESOLUTION
OF THE
SANTEE SIOUX TRIBE OF NEBRASKA

WHEREAS, the Santee Sioux Tribe of Nebraska is a Federal
Corporation organized pursuant to Section 16 of the
Act of June 18, 1934 (48 Stat. 984) (25 U. S. C. 476)
as amended by the Act of June 15, 1935, (48 Stat.
378), and,

WHEREAS, the Santee Sioux Tribe of Nebraska's Attorney, Marvin
J. Sonosky has informed the Santee Sioux Tribe of
Nebraska that the United States has offered settlement
in the amount of Thirty Nine Million Seven Hundred
Forty Nine Thousand Seven Hundred Dollars
($39,749,700) in the case Sioux Tribe of Indians vs.
The United States, No. 74 in the United States Claims
Court, and,

**120**

WHEREAS, the Santee Sioux Tribe's attorney, Marvin J. Sonosky, has advised the Tribe to accept the United States settlement offer,

NOW THEREFORE BE IT RESOLVED, that the Santee Sioux Tribe of Nebraska accepts the United States' settlement offer in the case Sioux Tribe of Indians vs. The United States, No. 74 in the United States Claims Court in the amount of Thirty Nine Million Seven Hundred Forty Nine Thousand Seven Hundred Dollars ($39,749,700) and further directs Marvin J. Sonosky to forthwith determine the Santee Sioux Tribe of Nebraska the proportionate share of the settlement and have the same paid over to the Santee Sioux Tribe of Nebraska.

CERTIFICATION

This is to certify that the foregoing Resolution was considered at a meeting of the Tribal Council of the Santee Sioux Tribe of Nebraska held on the ___9th___ day of ___October___, 1984, and was adopted by a vote of ___5___ for; ___1___ against; and ___2___ absent or not voting.

Dated this ___26th___ day of ___October___, 1984.

RECEIVED

OCT 29 1984

BIA=Winnebago, Agency
Winnebago, Nebraska 68071

Richard L. Kitto
Chairman, Santee Sioux Tribe
of Nebraska

ATTEST:

Clement D. Mackey
Secretary, Santee Sioux Tribe
of Nebraska

RECEIVED AND APPROVED:

Joseph L. Christie
Superintendent
Winnebago Agency

Date 10/29/84

LAW OFFICES

## SONOSKY, CHAMBERS, SACHSE & GUIDO

1050 31st STREET, N.W.

WASHINGTON, D.C. 20007

(202) 342-9131

MARVIN J. SONOSKY
HARRY R. SACHSE
REID PEYTON CHAMBERS
KENNETH J. GUIDO, JR.
WILLIAM R. PERRY
LLOYD BENTON MILLER
DONALD J. SIMON

KEVIN A. GRIFFIN
MARY V. BARNEY
DOUGLAS B. L. ENDRESON*
LOUISE LYNCH

*ADMITTED IN WISCONSIN

OF COUNSEL
LOFTUS E. BECKER, JR.

October 19, 1984

Mr. Richard L. Kitto
Chairman
Santee Sioux Tribal Council
Niobrara, Nebraska 68760

Re: <u>Docket No. 74 (1868 Treaty case) – Second Notice</u>

Dear Mr. Kitto:

I refer you to my letter of September 14, 1984, which you received as shown by the certified mail return receipt.

I remind you that November 1 is the deadline imposed by the Court in which to advise whether the Tribe will either accept or reject the offer in settlement. All tribes have responded now except Santee Sioux and one other.

Best personal regards,

Sincerely,

/s/ Marvin J. Sonosky

Marvin J. Sonosky

MJS/jbc

cc: Mr. Clement Mackey, Secretary
 Superintendent

CERTIFIED MAIL NO. 0818792
RETURN RECEIPT REQUESTED

EXHIBIT I–1

UNITED STATES GOVERNMENT

# memorandum

DATE: MAY – 4 1984

REPLY TO
ATTN OF: Tribal Operations, Code 102

SUBJECT: Fort Peck Sioux Resolution No. 3-84-2 - Docket 74

TO: Deputy Assistant Secretary - Indian Affairs (Operations)
Attention: Tribal Government Services, Code 440

From: Billings Area Director

This is a follow-up to our March 29, 1984 memorandum to your office concerning the above subject.

Attached is a copy of the minutes of the February 15, 1984 Fort Peck Sioux Council meeting at which Resolution No. 3-84-2 was enacted. Also attached is a copy of the Superintendent's memorandum of April 16, 1984 within which he describes the meeting and supports the action of the Fort Peck Sioux Tribe.

We concur with the Superintendent's interpretation of the propriety of addressing the matter by the Fort Peck Sioux Council.

Attachment

cc: Superintendent, Fort Peck Agency
Sonosky, Chambers, Sachse & Guido

RECEIVED MAY 7 1984

OPTIONAL FORM NO 10
(REV. 7-76)
GSA FPMR (41 CFR) 101-11.6
5010-112

UNITED STATES GOVERNMENT

# memorandum

**DATE:** April 16, 1984

**REPLY TO ATTN OF:** Superintendent, Fort Peck Agency

**SUBJECT:** Fort Peck Sioux Resolution 3-84-2

**TO:** Area Director, Billings Area Office
ATTN: Tribal Operations (Code 102)

In response to your memo of March 29, 1984 regarding the subject matter the following information is provided:

Date of Meeting: February 15, 1984

Presiding Officials: Albert Twin, Chairman & Sioux Council members

No. in attendance: 111 Fort Peck Sioux (constituting a quorum)

The Sioux Tribal Chairman brought to the floor the question of accepting the monetary award relative to Docket 74. A motion was made and seconded to accept the money award with a resulting vote of 64 for and 11 opposed, motion being carried (Resolution 3-84-2).

The question of accepting the money award, in my opinion, was properly raised, discussed, and voted on by the Sioux Tribe. Because of the propriety in which the issue was handled I have gone on record supporting the action of the Tribe.

Enclosed for your review and information is a copy of the Council minutes.

If I can be of further service in this matter please so advise.

Enc.

cc: Docket 74 File

DATE RECEIVED

APR 18 1984

TRIBAL OPERATIONS
BILLINGS AREA OFFICE

Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan OPTIONAL FORM NO. 10
(REV. 7-76)
GSA FPMR (41 CFR) 101-11.6
5010-112

8 Cl.Ct.—4

FORT PECK SIOUX COUNCIL MEETING
February 15, 1984

Members present: Albert Twin, Chairman Catherine Spotted Bird, Secretary
 Emmett Buckles Gerald Red Elk
 Calvin First Charlie Shields

Also present was: Frank Merchant, BIA Representative, Rena Comes Last arrived later.

Attending this Sioux meeting was 111 Fort Peck Sioux.

Mr. Gerald Red Elk lead in prayer.

Mr. Twin reported on the two claims, Docket 74B and Docket 74. These Claims have been thrown out of Court but the Sioux Nation once again put these Claims before Court where they are today.

Mr. Gerald Red Elk reported on Docket 74B and Docket 74. The delegates to Washington, D.C. will hand carry resolutions on accepting the monetary settlement on Dockets 74B and 74. A report was given on the decision made by Judge York. All Sioux Nations have 90 days to accept money from February 1, 1984.

Mr. Red Elk stated Fort Peck Sioux Tribe has always been a reasonable Tribe. The Fort Peck Sioux owe nothing to the Government. He was talking about the offsets.

If the people vote on not accepting Docket 74, the Sioux Nation stand to lose this Claim case. It is up to you people to vote on this.

Pearl Nation stated to accept this money means termination. Wanted to vote for land in Black Hills. Something to leave our children and grandchildren.

The Sioux delegates will be going to Washington, D.C. on the two treaties, talk to the Attorney, John Melcher and to file a petition on the decision made by Judge York.

Mr. William H. Payne's contract was brought up for renewal as his contract was extended for two years and contract was up in November 12, 1982. A motion was called for on the renewal of Mr. Payne's contract. Mr. Melvin Eagleman asked how much do we owe Mr. Payne? Mr. Emmett Buckles replied, until we win these claim cases, is when he gets his cut. Motion to renew Mr. Payne's contract by Percy Comes Last, seconded by Leonard Bear. Vote: 65 for, 9 opposed. Motion carried.

A motion was called for on delegation to Washington, D.C., Myrna Charbonneau made a motion for the same four that have been going on the condition that they give a full report on their return. Seconded by Joneta Hunkapillar. Vote: 73 for, 1 opposed. Motion carried.

Katherine Cloud Boy Traversie made a motion for Pearl Nation as a delegate, seconded by Leonard Bear. Vote: 7 for, 27 opposed. Motion lost.

The delegates will also check on the Sisseton Wahpeton.

A motion was called for on two alternates, Leland Spotted Bird, Melvin Eagleman, Sr. to the delegation. Motion by Ray K. Eder, for approval of these two for alternates, seconded by Percy Comes Last. Vote: 52 for, 0 opposed. Motion carried.

Mr. Red Elk stated the Fort Peck Sioux has accepted the money on the Black Hills and the other Sioux Tribes want the land back. He read a letter which was written to Patrick Spears by Mr. Marvin Sonosky in which he states I understand that the Sioux would seek the return of the land in the Black Hills. In my opinion, given sufficient time, Congress might be persuaded to transfer to the Sioux title to federal lands in the Black Hills without returning any part of the 180 million to the Government. We see no reason for surrendering this money, which belongs to the Sioux people.

The Fort Peck Sioux Tribe has already accepted the monetary settlement on Docket 74B. A resolution is already in Washington, D.C. The other Sioux Tribes did not accept the

monetary settlement but are seeking the return of Public Federal lands in the Black Hills. The Black Hills Steering Committee requested support from the Fort Peck Sioux Tribe.

A motion by Pearl Nation to table voting on supporting the other Sioux Tribes on the return of the Public Federal lands, seconded by Floyd Youngman. A vote was called for: 11 for, 13 opposed. Motion lost.

Ray K. Eder stated, I did not vote to accept the money and I would like to see the Fort Peck Sioux Tribe go down fighting for this land. I wouldn't want to go down in history as not going down fighting for this land. Ray K. Eder's motion was to support the other Sioux Tribes in fighting for the Public Federal lands in the Black Hills. Seconded by Melvin Eagleman, Sr. Vote: 73 for, 0 opposed. Motion carried.

A motion was called for on accepting the money on Docket 74. Motion made by Leonard Bear, seconded by Percy Comes Last. Vote: 64 for, 11 opposed. Motion carried.

Charlie Shields spoke against supporting the other Sioux Tribes and stated Fort Peck Sioux wants their money.

Charity Wing also spoke against supporting the seeking of the return of the Public Federal lands. This might effect us in getting the money.

Meeting is to be called on the return of the delegation.

Meeting was adjourned.

Lunch was served.

Attached are the resolutions, etc.

/s/ *Catherine Spotted Bird*
Catherine Spotted Bird, Secretary
Fort Peck Sioux Council

**APPROVED:**

/s/ *Albert Twin*
Albert Twin, Chairman
Fort Peck Sioux Council

---

RESOLUTION NO. #3-84-2

(Sioux Tribe of the Fort Peck Indian Reservation)

WHEREAS, the United States has offered to settle the claim of the Sioux Nation arising under the Treaty of April 29, 1868, in the case identified as No. 74 before the United States Claims Court; and

WHEREAS, the terms of the offer of settlement are expressed in a letter dated July 27, 1982, and signed by Assistant Attorney General Carol E. Dinkins; and

126

WHEREAS, the claims attorneys have submitted to the Tribal Council their written report dated January 25, 1984, recommending that the Tribe accept the offer in settlement;

NOW, THEREFORE, BE IT RESOLVED, That the offer made by the United States to settle for the entry of final judgment in the sum of $39,749,700 in Case No. 74 be and the same is hereby accepted and approved;

BE IT FURTHER RESOLVED, That the Tribe's claims attorney or the attorney of record is hereby authorized to sign and execute any writing or document that may be appropriate, or necessary, to carry out the settlement of this case.

## CERTIFICATION

This is to certify that I have compared the foregoing with the minutes of the meeting of the Fort Peck Sioux Council held at Poplar, Montana, on February 15 _____, 1984, a quorum being present and that the foregoing resolution was regularly adopted after a full and free discussion of the resolution and of the attorneys and of the delegates authorized to sign and that said resolution is true, complete and correct and that same has not been altered nor rescinded.

Secretary, Catherine Spotted Bird
Fort Peck Sioux Council

APPROVED:

Albert Twin, Chairman
Fort Peck Sioux Council

Superintendent, Fort Peck Agency

EXHIBIT I-2

LAW CFFICES

Sonosky,Chambers,Sachse & Guido
I050 3Ist Street,N.W.
Washington,D.C.20007

·Wolf Point,MT.
Sept.25,I984

Dear Mr.Sonosky:

Enclosed find your per request the Resclution # 8-84-6 adopted by 20 votes on June 8, I984 Cultural Center Poplar,Montana.

Ameeting was called by unknown,no notices put out in each District,Wolf Point Herald, Radio,only in the Tribal news paper the Wotanin Wowapi through the paper Sioux members from South Dakota and from Canada were invited.

I,attended the June 7 meeting,I called the meeting to order then I requested Gerald-Red Elk to conduct the meeting,only Federal lands were discussed.recessed. I did not attend the June 8 meeting,Gerald Red Elk conducted the meeting,motion made to select a temperary Chairman,Emmett Buckles was elected.

A resolution was presented by a an Executivve Board member to rescind THE the Sioux Council resolution in Docket #74 and Docket # 74-B request its share of the award.

I send Senator John Melcher news paper clippings from the Tribal Wotanin Wowapi which gives the whole proceeding as to what happen. If you would contact the Senator's office I'm sure they will furnish you the proceedings. We will call another meeting to discuss and reconsider the settlement offer.

Any information that you might furnish me will be appreciated.

Sincerely
*Albert Twin*
Albert Twin Fort Peck Sioux Council Chm.
P.C.Box I05
Wolf Point,MT.5920I

SIOUX COUNCIL RESOLUTION #8-84-6

WHEREAS; the Fort Peck Tribe's Sioux Council of the Fort Peck Reservation is a recognized body of people called to act officially in all business matters affecting their relationship with the Government of the United States, and

WHEREAS; the Fort Peck Sioux Tribe desires to join with other organized tribes which are successors in interest to the sovereign bands of the Great Sioux Nation, namely:

> Cheyenne River Sioux Tribe
> Standing Rock Sioux Tribe
> Oglala Sioux Tribe
> Rosebud Sioux Tribe
> Santee Sioux Tribe
> Crow Creek Sioux Tribe
> Lower Brule Sioux Tribe

THEREFORE BE IT RESOLVED; the Fort Peck Reservation Sioux Council does hereby approve and support the coordinated assertion by the member tribes of their claims to retain lands in the Black Hills and refuse compensation for the extinquishment of title to such lands in the Black Hills.

BE IT FURTHER RESOLVED; the Fort Peck Reservation Sioux Council hereby states it's . membership in the Black Hills Steering Committee and endorses the purposes of such Black Hills Steering Committee.

BE IT FURTHER RESOLVED; that all prior actions taken by the Fort Peck Sioux Council concerning the Black Hills Dockets 74 and 74B is hereby rescinded.

C E R T I F I C A T I O N

I, the undersigned Secretary of the Sioux Council of the Fort Peck Reservation here-
by certify that the foregoing resolution was adopted by __21__ vote for, __0__ opposed
at a meeting held at the Tribal Cultural Center, Poplar, Montana on June 8, 1984.

Catherine Spotted Bird, Secretary
Fort Peck Sioux Council

APPROVED:

Emmett Buckles, Acting Chairman
Fort Peck Sioux Council

Superintendent, Fort Peck Agency

---

EXHIBIT J

RESOLUTION NO. __89-84__

(Standing Rock Sioux Tribe)

WHEREAS, The United States has offered to settle the claim of the Sioux Nation
arising under the Treaty of April 29, 1868, in the case identified as No. 74
before the United States Claims Court; and

WHEREAS, The terms of the offer of settlement are expressed in a letter dated
July 27, 1982 and signed by Assistant Attorney General Carol E. Dinkins; and

WHEREAS, the claims attorneys have submitted to the Tribal Council their written
report dated January 25, 1984, recommending that the Tribe accept the offer in
settlement; and

WHEREAS, the Tribal Council has considered the offer in settlement.

NOW, THEREFORE BE IT RESOLVED, that the offer made by the United States to
settle for the entry of final judgement in the sum of $39,749,700.00 in Case
No. 74 be and the same is hereby rejected and disapproved.

BE IT FURTHER RESOLVED, That the Tribe's claims attorney or the attorney of
record is hereby authorized to notify the appropriate officials of the decision
of the Standing Rock Sioux Tribal Council to reject the offer to settle Case
No. 74.

BE IT FURTHER RESOLVED, That the Chairman and Secretary of the Standing Rock
Sioux Tribal Council be authorized and instructed to sign this resolution for
and on behalf of the Standing Rock Sioux Tribe.

CERTIFICATION

We, the undersigned Chairman and Secretary of the Tribal Council of the Standing
Rock Sioux Tribe, hereby certify that the Tribal Council is composed of 15 members,
of whom ___14___ constituting a quorum, were present at a meeting thereof, duly and
regularly called, noticed, convened and held on the __24__ day of __April__, 1984,
and that the foregoing resolution was duly adopted by the affirmative vote of
__12__ members, with__0__ opposing, and with__2__ not voting. The Chairman's vote
is not required except in case of a tie.

Dated this __24__ day of __April__, 1984.

ATTEST:

Charles W. Murphy, Chairman
Standing Rock Sioux Tribal Council

Elaine Brave Bull, Secretary
Standing Rock Sioux Tribal Council

· (OFFICIAL SEAL)